346 F.Supp. 1071 (1972)
Bernard SAMOFF, Regional Director of the Fourth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD
v.
The BUILDING AND CONSTRUCTION TRADES COUNCIL OF PHILADELPHIA and Vicinity.
Civ. A. No. 72-634.
United States District Court, E. D. Pennsylvania.
July 7, 1972.
*1072 Joseph Kelly, NLRB, Philadelphia, Pa., for petitioner.
Meranze, Katz, Spear & Bielitsky, Bernard N. Katz, Philadelphia, Pa., for respondent.

OPINION
EDWARD R. BECKER, District Judge.

I. PRELIMINARY STATEMENT
Samuel E. Long Inc. ("Long") is a general contracting firm which is engaged in the construction of an addition to a school in West Chester, Pennsylvania. The workmen who are employed directly by Long are not members of any labor union. The Building and Construction Trades Council of Philadelphia and Vicinity ("Council") is an unincorporated association whose membership is composed of delegates from some 163 craft unions and councils in the building and construction industry in Philadelphia County and the surrounding counties of Delaware, Chester, Montgomery and Bucks in Southeastern Pennsylvania. While its functions are many, the Council does not, qua Council, seek to organize or act as a collective bargaining representative for individuals employed *1073 by any firm engaged in the construction industry.
On January 24, 1972, the Council commenced picketing at the East Junior-Senior High School construction site, where Long is the general contractor. It is undisputed that the picketing has continued from January 24 to the present time and that it has brought the work, which is approximately 35% complete, to a virtual halt, because the employees of those union subcontractors who are on the job have refused to cross the picket line.
This case arises under § 10(l) of the Labor Management Relations Act ("Act"), 29 U.S.C. § 151 et seq. The petitioner, Bernard Samoff ("Samoff"), Regional Director of the Fourth Region of the National Labor Relations Board ("Board") has sought, on behalf of the Board, a preliminary injunction restraining the picketing on the grounds that it violates § 8(b) (7) (C) of the Act (see text infra). In general, § 8(b) (7) (C) proscribes organizational or recognitional picketing for more than thirty days without the filing with the Board of a petition for certification under § 9(c) of the Act. The Council contends that its picketing is not for any organizational or recognitional purpose, but rather, to obtain from Long what is known in the construction industry as a "subcontractors agreement," i. e., an arrangement pursuant to which a general contractor agrees that whenever he subcontracts work on any construction job, he will employ only subcontractors who, before commencing work on the job site, have entered into collective bargaining agreements with craft unions affiliated with the Council. The Council asserts that picketing for this purpose is not proscribed by § 8(b) (7) (C). On the other hand, the Board contends that, even if we find that the Council's purpose in picketing was not, as the Board asserts, to organize Long's employees, § 8(b) (7) (C), read in the context of this case, also prohibits picketing by the Council for a subcontractors agreement. The theory behind this contention is that the objective of the Council's picketing is to force Long to deal with it on a matter (subcontracting) which is a proper subject of collective bargaining and which inevitably and substantially affects the working conditions of Long's employees; that the picketing is, a fortiori, recognitional in nature; and that it is therefore in violation of § 8(b) (7) (C).
In support of its position, the Board relies heavily on a case emanating from the Court of Appeals for the District of Columbia Circuit, Dallas Building and Construction Trades Council v. N. L. R. B., 130 U.S.App.D.C. 28, 396 F.2d 677 (1968), and also upon a case on which Dallas in turn relies, Centralia Bldg. and Constr. Trades Council v. N. L. R. B., 124 U.S.App.D.C. 212, 363 F.2d 699 (1966). Notwithstanding the Board's reliance, neither Dallas nor Centralia deals with the factual situation which is involved here, and Dallas, which is the closer case of the two on the facts, deals with § 8(b) (7) (A) which, for reasons discussed infra, has a significantly different thrust. In fact, there is no case reported or unreported which we could find or to which able counsel could direct us which squarely deals with the question whether subcontractor picketing violates § 8(b) (7) (C), a question which, we note, is apparently growing in importance because of the increasing use by building trades councils of the subcontractor picketing device.
We have reviewed the evidence taken at the extensive preliminary injunction hearing which we held in the case, and have studied the parties' briefs. We find (see infra) there is reasonable cause to believe that the purpose of the picketing was not to organize Long's employees, but to obtain from Long a subcontractors agreement. We are unmindful neither of the Board's legal position which it has cogently expressed that subcontractor picketing violates § 8(b)(7)(C), nor of its concern that widespread contractor picketing will impede the flow of commerce; however, for the reasons which follow, we do not *1074 read § 8(b) (7) (C) as proscribing that type of picketing. Accordingly, despite our limited role in § 10(l) proceedings,[1] the Board's prayer for injunctive relief will be denied.
Before analyzing the Act, the legislative history and the caselaw, we must set forth the findings of fact which underly our ultimate conclusion. We will also deal in this Opinion with the assertion by the Council that it is not a labor organization within the meaning of the Act and that it is therefore not subject to § 8(b) (7) (C) at all.[2]

II. PURPOSE OF THE PICKETING
The record has raised a factual dispute as to the purpose of the picketing. The picketing commenced on the morning of January 24, 1972. At that time Robert Williams ("Williams") and Charles Boyer ("Boyer"), who are delegates to the Council, went to the scene to supervise the picketing. Acting on the instructions of Thomas Magrann ("Magrann"), the Council's business agent, they sought and obtained a meeting with the principal of the school for the purpose of requesting the school authorities to erect a sign directing construction workers to the construction entrance, which is separate from the main entrance to the junior high school, so that there could be no disruption of school activities. According to William K. Dowler and Donald R. Howland, school officials who were present at the meeting, Williams stated that the nature of the picketing was "organizational," and that they were there "to organize Sam Long because he is non-union."[3] This part of the conversation lasted about 35 seconds during a fifteen minute meeting. Based upon this evidence, the Board has asked us to find that there is reasonable cause to believe that the purpose of the picketing was in fact to organize Long's employees.
The Council has not attempted to controvert the fact of Williams' replies; it has however argued that they are not entitled to credence. This argument stems from the Council's contentions that Williams had no authority to make representations as to the purpose of the picketing and that he was in any event totally incorrect as to its purpose as shown by the explicit record of official union action. We credit the Council's position, and recite the following as background for our finding that there is reasonable cause to believe that the purpose of the picketing was not to organize Long's employees, but to obtain from Long a subcontractors agreement.
*1075 In September of 1971, the Board and the Council entered into a stipulation terminating the § 10(l) proceedings between them before Judge Alfred L. Luongo of this Court, arising out of the Council's picketing of a firm known as Office Developers Inc.[4]Inter alia, that stipulation, which was approved by the Court, recited that if the Council were to resume picketing solely for the purpose of forcing Office Developers Inc. to agree to use only union subcontractors, it would not be considered in violation of a decree entered by the Court proscribing violations of § 8(b) (7) (C). Following the Office Developers stipulation, Bernard N. Katz, Esq. ("Katz"), the Council's attorney, advised the Council to use the subcontractor picketing device in appropriate situations. The Council thereupon undertook an orientation program looking toward future use of subcontractor picketing.[5] On October 17, 1972, Katz addressed the Council members at their regular meeting with respect to the incidents of subcontractors agreements and the guidelines for subcontractor picketing.
By December of 1971, the Council had become aware that the Long job was progressing in West Chester. On December 7, 1971, pursuant to authorization by Magrann, Katz wrote to Samuel Long, the principal of the corporation. After reciting that Long was not a party to a subcontractors agreement, Katz stated:
"This office is counsel for the Building & Construction Trades Council of Phila. & Vicinity. We have been advised that you are performing work within the jurisdiction of the Council and that you are not a party to a subcontractors agreement under which you would be obliged to subcontract to organizations dealing with craft unions affiliated with the Council.
"Picketing is presently being contemplated at such of your operations as the school construction in West Chester, Penna. Such picketing will have as its objective solely the obtaining of the referred to agreement. It will not have as its objective any actions which are in any way limited or prohibited by the Labor Management Relations Act of 1947." (emphasis added).
Samuel Long received but did not respond to the letter. At the Council's mid-December meeting, the Long situation was discussed and the Council was advised by Magrann that subcontractor picketing was being contemplated. On January 19, 1972, the Council again met with Williams and Boyer in attendance. At that meeting, the Council authorized the picketing of Long to obtain a subcontractors *1076 agreement. The minutes of the meeting reflect this decision and recite that the picket lines were to be established on January 24, 1972, at 7:30 A.M., as they, in fact, were. The signs carried by the pickets read:
"NOTICE
Sam Long Contractor Refuses to enter into a Sub-Contractors Agreement with the Philadelphia, Pennsylvania Building & Construction Trades Council AFL-CIO"
The purpose of the Union's picketing at the East High School site was also the subject of testimony at the hearing by Magrann and Katz. Both witnesses testified unequivocally that the (ongoing) picketing has but one purpose: to compel Long to execute a subcontractors agreement with respect to future jobs. They emphatically eschewed any intention to organize Long's employees or to affect the present job in any way, even with respect to non-union subcontractors to whom contracts had been let but who have not yet entered on the job. They also pointed out that a subcontractors agreement does not require Long to subcontract work; Long is free to subcontract or not as it chooses. The agreement applies only when Long chooses to engage subcontractors. The form of subcontractors agreement sought by the Council was introduced into evidence (P6). That agreement provides, in pertinent part, that:
"1. The General Contractor agrees to provide in its specifications when doing any business with subcontractors for work on the job site, that such subcontractors as a condition precedent to their commencing work on the job site will be signed with a member union of the Council who is the recognized collective bargaining agent of the particular trade.
2. The General Contractor agrees that no subcontractors will be awarded any work on the job who do not meet the provisions of Paragraph 1 above and that no such subcontractor will be permitted to perform any work on the job."[6]
The testimony about the letter to Long and the Council meetings is uncontradicted. We credit that testimony as well as that of Magrann and Katz as to the purpose of the picketing. The bylaws of the Council are consistent with this testimony as is the further testimony of Magrann and Katz that the Council never seeks to organize employees in the building trades and to act as their collective bargaining representative. We therefore find reasonable cause to believe that the purpose of the Council's picketing is to attempt to secure from Long a subcontractors agreement, not to organize Long's employees or to obtain for the Council or any of its affiliated craft unions recognition from Long as their bargaining agent. We recognize the validity of the proposition that picketing may have more than one purpose, and that, in order to violate § 8(b) (7) (C), it is necessary only that organization and recognition be a purpose of the picketing.[7] However, we find no reasonable basis for the conclusion that the picketing had any purpose other than seeking a subcontractors agreement.[8] *1077 Whether the law deems that purpose to be recognitional in character will be discussed, infra.

III. IS THE COUNCIL A LABOR ORGANIZATION WITHIN THE MEANING OF THE ACT?
The Council has contended that it is not a labor organization (or an agent for a labor organization) within the meaning of the Act, and therefore not subject to injunctive relief because § 8(b) (7) applies only to the actions of labor organizations or their "agents." Section 2(5) of the Act defines "labor organization" as follows:
"The term `labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."
Many facts pertaining to the nature and activities of the Council were adduced at the hearing. These facts stem, in part, from the Council's by-laws and in part from testimony as to the Council's practices.
One of the Council's main objectives is to enlist the cooperation of its component local unions, to the end that adequate wage scales and working conditions be established and maintained in the building industry. The Council's jurisdiction encompasses "full autonomy over all matters affecting all workmen engaged in said [building] industry." The duties of the Council's business manager include the representation of the Council and its members in matters pertaining to agreements, working conditions, complaints, disputes and organization. The business manager has the power to "order all strikes" when instructed to do so by the Council or its Executive Board, and to order employees on a struck job to leave it. He has the duty to report to the Council any member of an affiliated craft who refuses to stop work when ordered.
In general, the delegates to the Council are salaried officials of the local unions which they represent. The number of delegate votes allotted to affiliated locals is determined by the number of members the local has. The Council's officers are elected from among the delegates. Members of the local unions which send delegates to the Council are not, as such members of the Council. However, members of the affiliated locals pay dues to the Council and must have their Council membership card in their possession at all times. Moreover, members of the local unions generally act as pickets on the various strikes called by the Council.
The Council does not, as such, seek to organize the employees of any given employer in any given trade or to act as the collective bargaining representative of such employees. However, it assists its affiliated locals in organization drives and it negotiates and deals directly with employers in the construction industry over certain matters. First of all, as this case exemplifies, the Council attempts to obtain subcontractor agreements. Secondly, it receives complaints from employees concerning employers who are not meeting area standards and engages in picketing to enforce area standards. Thirdly, it deals with the General Building Contractors Association Inc. ("GBCA") which represents the employers in its five county area to obtain an agreement setting forth the conditions under which elevator service shall be furnished to transport workmen in its affiliated trades while buildings are in the course of construction. Fourthly, it deals with the GBCA concerning jurisdictional disputes. Finally, and most recently, the Council has sought *1078 and obtained from the GBCA a so-called multi-trade agreement tying together the commencement and expiration dates of the collective bargaining agreements of the affiliated trades in the five-county area.
The foregoing facts indicate that the Council exists, at least in part, for the purpose of dealing with employers concerning labor disputes, wages, rates of pay, hours of employment and conditions of work, and that employees participate in its activities so as to bring it within the concept of a labor organization as defined in § 2(5). We therefore find that there is reasonable cause to believe that the Council is a labor organization within the meaning of the Act.[9]
This conclusion finds support in numerous decisions of the Board. Building and Construction Trades Council of Orange County, 157 NLRB 375 (1966); International Brotherhood of Electrical Workers, Local 1 (Building and Construction Trades Council of St. Louis), 164 NLRB 313 (1967); Local 60, International Association of Bridge, Structural and Ornamental Iron Workers, and Nalews, Inc., 177 NLRB 289 (1969); Building and Construction Trades Council of Reading and Berks County, 155 NLRB 1184 (1965); Alton-Wood River Building and Construction Trades Council, 114 NLRB 260 (1963). In each of these cases, the Board held that building and construction trades councils whose by-laws and activities were similar to the Council involved in the present case were labor organizations within the meaning of the Act.[10] There are some Board cases holding that district trade councils are not labor organizations within the Act, see Magnavox Company, 111 NLRB 379 (1955); Monsanto Chemical Company, 119 NLRB 69 (1957). However, these cases dealt with the status of councils as labor organizations vis-a-vis certain filing requirements of the Act. On the other hand, the cases cited above in which the Board has found councils to be labor organizations are cases in which, as in the case at bar, the council engaged in picketing, and in which the Board filed an unfair labor practice charge bottomed on either § 8(b) (4) or § 8(b) (7).[11]
In the Alton-Wood River case, supra, the Board, in what we agree is the proper approach, viewed the by-laws and activities of the council "in their entirety." It thereupon found that the council was the organization through which the affiliated crafts functioned as a unit, and concluded that the council was "dealing with" employers, even though the recognition which the council sought by its picketing was for its affiliated local. In the Nalews case, supra, the Board found that the council was engaged in a joint enterprise with its affiliated unions in furtherance of their interest with regard to wages, hours and working conditions, and that it acted as their agent in matters of common interest. The Board's decision in the Reading and Berks County case, supra, was to the same effect and stressed the broad import of § 2(5).
It may be (although we doubt that they can be read so narrowly) that these last cited cases turn on the fact that § 8(b) (7) applies to "agents" of labor organizations, and that they in fact hold that the councils involved were acting as agents for their local unions and thus were subject to the proscriptions of the Act. If they do, they equally support our determination.
*1079 Having concluded that there is reasonable cause to believe that the Council is subject to the Act,[12] we must now analyze the factors bearing upon whether there is reasonable cause to believe that it has violated it.

IV. DOES THE ACTION OF THE COUNCIL IN PICKETING TO SEEK A SUBCONTRACTORS AGREEMENT FROM LONG CONSTITUTE A VIOLATION OF § 8(b) (7) (C) OF THE ACT?
Section 8(b) (7) of the Act, in pertinent part, provides:
"Sec. 8(b) It shall be an unfair labor practice for a labor organization or its agents . . . .
(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:
(A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under Section 9(c) of this Act, . . . or
(C) where such picketing has been conducted without a petition under Section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: Provided, that when such a petition has been filed the Board shall forthwith, without regard to the provisions of Section (c) (1) or the absence of a showing of substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: . . ."[13]
Resolution of the matter before us requires that we address ourselves to the meaning of the notions of organization and recognition embodied within § 8(b) (7).
We have found that there is reasonable cause to believe that the Council's sole purpose was to secure a subcontractors agreement from Long, and that it did not seek to set up itself or any of its affiliated local unions as the bargaining agent for Long's employees. This conclusion would seem, at least at first blush, to rule out any notion that the picketing had an organizational or recognitional purpose. The Board, however, asserts that such a reaction is too simplistic, and misconceives the meaning at least of the term "recognition" within the framework of the Act. For, in the Board's view, the act of seeking from a building trades employer such as Long, an agreement to subcontract only to firms which have entered into collective bargaining agreements with craft unions affiliated with the Council is an act which looks toward or partakes of recognition of the Council by Long with respect to terms and conditions of employment.[14]
*1080 In support of its position, the Board notes that the decision of the Supreme Court in Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) establishes that stipulations with respect to contracting out of work performed by members of a bargaining unit is a "term and condition of employment" for which collective bargaining is required. The argument continues to the effect that execution of a subcontractors agreement would indeed affect the right of Long's employees to select their exclusive bargaining agent because, by virtue of the agreement, the Council would have assumed the role of the Long employees' exclusive collective bargaining representative at least as to one significant and mandatory subject of bargaining (i. e., subcontracting), and because the status of any other bargaining agent subsequently selected by Long's employees would concomitantly be hampered. The Board attempts to apply the force of judicial precedent to these contentions through the vehicle of Dallas Building and Construction Trades Council v. NLRB, supra.
In Dallas, the court had before it a petition for review and a cross petition for enforcement of an Order of the Board which had concluded that the Dallas Building and Construction Trades Council had violated § 8(b) (7) (A) by picketing with a recognitional objective at a time when, under the Board's contract bar rules, no question of recognition could be raised. The invervenor was Dallas County Construction Employers Association, Inc., which had collective bargaining agreements with the local craft unions affiliated with the Trade Council. The case was set against an unusual background. Four of the council's eight local union affiliates, after negotiations, had entered into contracts with the Association which did not contain subcontracting clauses, but which contained other improvements in wages and working conditions in lieu thereof. The council, on the other hand, was now proposing to the Association that it sign a subcontractor agreement with it and persisted in this demand. When the Association refused, notwithstanding the council's rather stark conflict with its affiliated locals, it commenced picketing against the Association to compel the signing of a subcontractor agreement, leading to the charges and counter-charges before the Board.
In view of the fact that the Dallas Council (like the Philadelphia Council) did not directly organize employees in the building trades, the Dallas court had to confront the question of whether the council's picketing had a recognitional objective. The court found that it did and, therefore, held that the picketing violated § 8(b) (7) (A). In so doing, the court observed as follows:
"[W]hile the legislation was initially motivated by blackmail picketing and inter-union warfare, the proscriptions of Section 8(b) (7) are not confined to that context. Congress in terms outlawed any picketing which sought to compel the employer to recognize and deal with a nonrepresentative labor organization on the subjects which could substantially affect the working conditions of the employees. And the agreement proposed by the Council would have a significant impact upon some of the general contractors' employees. The Supreme Court has recognized that subcontracting is a mandatory bargaining subject; and the Board has found in this case that the adoption of the proposed agreement might vitally affect the number of employees hired by the general contractors. This is so because there are some types of work, laboring and mill-wrights' work, for example, which the general contractors sometimes subcontract and sometimes perform with their own employees. Without a union signatory agreement as proposed by the Council, the general contractors are likely to send out such work to relatively cheaper, non-unionized subcontractors *1081 rather than to perform it with their own higher-cost union employees." (footnote omitted).
The Dallas holding was followed in Lane-Coos-Curry-Douglas Counties Bldg. & Construction Trades Council v. NLRB, 415 F.2d 656 (9th Cir. 1969) (Carter, J., dissenting).
In its discussion of the issues, the Dallas court relied upon its prior decision in the case of Centralia Bldg. and Construction Trades Council v. NLRB, 124 U.S.App.D.C. 212, 363 F.2d 699 (1966), which upheld the Board's determination that picketing by an unrecognized council to obtain an agreement from a nonunion employer obligating him to pay his employees union scale wages and fringe benefits was recognitional and therefore in violation of § 8 (b) (7) (C). In language which is also relied upon by the Board in this case, the Dallas court stated:
"Centralia, however, does not mean that Section 8(b) (7) is violated only when the picketing union seeks to preempt the entire scope of interest of a recognized representative of the employees. The thrust of Centralia is that, so long as the union seeks a contract dealing with a subject relating to the conditions of employment of the general contractors' own employees, the picketing is recognitional within Section 8(b) (7)." (emphasis added). Id., 396 F.2d at 683.
As we have noted, since subcontracting is a condition of employment upon which Long's employees, if organized, might bargain, see Fibreboard Paper Products v. NLRB, supra, the Board contends that the language from Centralia, adopted in Dallas, requires a finding that the picketing was recognitional in character here. We do not agree.
We note that in Centralia, at the critical point in its Opinion, the court observed:
"With such an agreement in effect [i. e., that the wage and fringe benefits of the contractors employees would be comparable to those under union agreements], very little would be left in the field of collective bargaining to a representative chosen by Pacific's employees, and therefore the will and choice of employees when and if exerted with respect to a bargaining agent would be thwarted and nullified." Id., 363 F.2d at 701.
The court seems to be saying that the extent to which the picketing organization is seeking to assume normal collective bargaining functions with regard to an employer's employees is determinative of whether the picketing has a lawful or unlawful objective under § 8 (b) (7). We view the Centralia case as setting forth this proposition and nothing more. It is thus distinguishable from the case before us because of the relatively small effect that the subcontracting agreement would have on the ability of Long's employees to engage in the full panoply of normal bargaining functions.
Furthermore, even though the Dallas court appears to be extending the Centralia rule, we agree with the Council that Dallas is not apposite here. Dallas was a § 8(b) (7) (A) case with critically different emphasis. For § 8(b) (7) (A) proscribes picketing where a certified representative already exists and "a question concerning representation may not appropriately be raised under § 9(c) of the Act. . . ." Dallas was a case in which the court found that the actions of the Council were an improper intrusion into a subject matter which a certified union had made bargainable and had bargained upon. Subcontracting proposals had been rejected and traded off for other benefits, and the Court reasoned that if the council's subcontracting agreement were signed by the contractors association, the already recognized union would be deprived of substantial bargaining leverage in the future. Moreover, the courts in Dallas and Lane-Coos were faced with the startling and unseemly situation of a trade council seeking to undermine the status of one of its own members and their holdings, we believe, *1082 may also be interpreted, sui generis, as a special and perhaps appropriate response thereto. In the present case, these problems do not exist. Long's employees are not represented; there has been no bargaining on their behalf.
We do not believe, however, that the Board's application of the Dallas rationale may be disposed of with finality by merely distinguishing Dallas and Centralia on their facts. The notion that coercive action by a labor organization looking towards a contract relating to the conditions of employment of the contractor's own employees must be deemed to be recognitional in character for § 8 (b) (7) (C) purposes regardless of whether the labor organization seeks to become the collective bargaining agent of those employees is a thoughtful one. We must therefore deal with it in terms of the legislative history and meaning of § 8(b) (7) (C) as well.
The legislative history of § 8(b) (7) (C) makes it clear that the section was principally directed to "blackmail picketing," or picketing by a union to achieve exclusive representation without a majority showing of interest. In enacting the section, Congress wished to encourage prompt resort to the election machinery rather than protracted picketing, as the method for resolving representation questions. See, e. g., 105 Cong.Rec. 1152-1153, II 1959 Leg.Hist. 976; 105 Cong.Rec. 1567, II 1959 Leg. Hist. 993; 105 Cong.Rec. 1568-69, II 1959 Leg.Hist. 994-995; 105 Cong.Rec. 5464, II 1959 Leg.Hist. 1029; 105 Cong. Rec. 5951-5970, II 1959 Leg.Hist. 1174-1193; and also, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 at pp. 470-473:
"The McClellan committee found that `the weapon of organizational picketing had been abused' by its use without regard to the desires of the employees in question. . . . Organizing from the top rather than persuasion of the employees has become the standard organizing procedure of many unions. . . . The union seeks to bring economic pressure directly upon the employees to force them to join the union in order to protect their jobs. . . . Such picketing also has the purpose of coercing the employer into recognizing the union and signing a contract with it, thus forcing the employees to join, even though the employees have shown that they do not want the union as their bargaining agent. It would be difficult to imagine a tactic more alien to the free choice with respect to unionization that the Taft-Hartley Act guaranteed to employees. . . ."
The leading case construing § 8(b) (7) (C) is the decision of the Board in Charles A. Blinne, d/b/a C. A. Blinne Construction Co., 135 NLRB 1153 (1962). In that case, the Board observed:
"The intent of subparagraphs (A) and (B) is fairly clear. Congress concluded that where a union has been lawfully recognized and a question concerning representation cannot appropriately be raised, or where the employees within the preceding twelve months have made known their views concerning representation, both the employer and the employees are entitled to immunity from recognition or organization picketing for prescribed periods.
Congress did not stop there, however. Deeply concerned with other abuses, most particularly `blackmail' picketing, Congress concluded that it would be salutary to impose even further limitations on picketing for recognition or organization. Accordingly, subparagraph (C) provides that even where such picketing is not barred by the provisions of (A) or (B) so that picketing for recognition or organization would otherwise be permissible, such picketing is limited to a reasonable period not to exceed thirty days unless a representation petition is filed prior to the expiration of that period. Absent the filing of such a timely petition, continuation of the picketing beyond the reasonable period becomes an unfair labor practice. *1083 On the other hand, the filing of a timely petition stays the limitation and picketing may continue pending the processing of the petition. Even here, however, Congress by the addition of the first proviso to subparagraph (C) made it possible to foreshorten the period of permissible picketing by directing the holding of an expedited election pursuant to the representation petition." (footnotes omitted, emphasis added.)
As we have seen, from our recitation of the Act, a violation of § 8(b) (7) (C) occurs only where picketing has been conducted (for a reasonable time, not to exceed 30 days) without the filing of a petition under § 9(c). However, representation petitions under § 9 (c) lead to representation elections and are filed only by labor organizations who have entered into efforts to organize employees and who seek recognition as their collective bargaining agent. There is no provision in the scheme of things established by the Act and implemented by the Board for employees to select a representative to bargain for them on one subject, such as subcontracting. The just recited excerpts from the legislative history and the Board's observations in Blinne, with their emphasis on these factors, comport with the view with which we agree, that the sole focus of § 8(b) (7) (C) is upon picketing which has as its objective the organization of employees by a labor organization and recognition of that labor organization as the full collective bargaining agent of those employees, and nothing less than that (e. g., what is stated to be a "recognitional purpose" in Centralia and Dallas). Section 8(b) (7) (A), upon which Dallas turned, is not tied together with § 9 (c) certification petitions. The broadened notion of recognitional picketing may comport with the congressional intent vis-a-vis § 8(b) (7) (A), so as to prevent the undermining of a duly certified bargaining representative at a time when no question of representation may be raised. It does not comport with the congressional intent vis-a-vis § 8(b) (7) (C), for, had Congress meant to proscribe picketing by § 8(b) (7) (C) other than for purposes of organization and recognition in the conventional sense, i. e., to organize employees and compel the employer to recognize the union as their bargaining agent, it would not have geared § 8(b) (7) (C) violations to failure to file a § 9(c) representation petition which leads to a Board supervised election.
Our view as to what type of picketing Congress was concerned with in § 8(b) (7) (C) is confirmed by other sources as well. Senator Ervin noted:
"Recognition picketing is picketing which is designed to compel the employer to accept the union as the bargaining agent for the employees, regardless of whether the union represents a majority of the employees." (emphasis added) 105 Cong.Rec. 5960, II 1959 Leg.Hist. 1183.
Professor Archibald Cox, one of the participants in the struggle for the passage of the 1959 amendments, has observed in an article, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn.L.R. 257 at 265:
"In both state decisions and NLRB reasoning there has been a tendency to distinguish picketing for recognition from organizational picketing. The Landrum-Griffin amendments wisely ignore the purely verbal distinction and treat them alike. . . ." (footnote omitted).
The view that § 8(b) (7) (C) alludes to organization and recognition in the conventional sense has been accepted by the Board, see Pass Development Inc., 154 NLRB 169 (1964), and by another learned commentator in addition to Professor Cox, see Van Arkel,[15] Picketing Under the 1959 Amendments, Thirteenth Annual New York University Conference on Labor 201 (1960). That view as we *1084 have explained it is the first basis of our conclusion that § 8(b) (7) (C) is not applicable to the facts of the case at bar, in which the Council does not seek to organize Long's employees or to act as their collective bargaining agent.[16]
Further light is also shed on the subject of the type of picketing which is encompassed within § 8(b) (7) (C) by a discussion of a controversy over a matter which, for some time, split the Board. The controversy arose in the early Board cases involving area standards picketing, by which a labor organization seeks to compel an employer to confer upon his employees wages and/or working conditions similar to those enjoyed by union members in the area. In Calumet Contractors Ass'n, 133 NLRB 512 (1961), the Board held:
"Respondent's admitted objective to require the Association . . . to conform standards of employment to those prevailing in the area, is not tantamount to, nor does it have an objective of, recognition or bargaining. A union may legitimately be concerned that a particular employer is undermining area standards. It may be willing to forgo recognition and bargaining provided subnormal working conditions are eliminated from area considerations."
In Keith Riggs Plumbing and Heating Contractors, 137 NLRB 1125 at 1126 (1962), the Board observed:
"A labor union normally seeks to organize the unorganized and to negotiate collective bargaining contracts with employers; but it also has a legitimate interest apart from organization or recognition that employers meet prevailing pay scales and employee benefits, for otherwise employers paying less than the prevailing wage scale would ultimately undermine the area standards. Indeed the importance of maintaining area standards as a matter of public as well as union interest was long ago endorsed by Congress by its enactment of the Davis Bacon Act (40 U.S. Code, Section 276a et seq.) relating to public contracts. It has application, of course, whether or not employees of public contractors are organized or have a collective bargaining contract.
Hence, if a union pickets and says to an employer, `We only want you to pay the prevailing wage scale, but don't want to bargain with you or organize your employees,' and there is no independent evidence to controvert this statement of objective, the Board cannot find that the picketing has organization, recognition or bargaining objectives. . . ."
Board members Rodgers and Leedom dissented in Calumet, in Keith Riggs, and in Houston Building and Construction Trades Council (Claude Everett Construction Co.), 136 NLRB 321 *1085 (1962) (involving standards picketing by a building trades council). They believed that the Board was unduly restricting the definition of organizational and recognitional picketing. Indeed, it has been argued that all labor union picketing has organization as its ultimate, if indirect, purpose. However, neither this philosophy nor that of members Rodgers and Leedom has prevailed. There are cases in which the Board has found coercive action to have a recognitional objective, independent of a purpose to organize and bargain, see Cartage and Terminal Management Corporation, 130 NLRB 558 (1960), and Lewis Food Company, 115 NLRB 890 (1961), but these cases deal with picketing by local unions, not trade councils, who were in position to organize. Moreover, in Lewis, an organizational objective was also found to be present, while in Cartage it was very much present in the background.
Whether or not Centralia was incorrectly decided, as the Council contends, because of its failure to permit the picketing which was therein involved to continue as area standards picketing is a matter with which we need not concern ourselves. However, although, as indicated above, Dallas' broadened concept of picketing for recognition may be acceptable for purposes of § 8(b) (7) (A), insofar as that decision may be viewed as establishing a rule governing recognitional picketing for § 8(b) (7) (C) purposes as well (and we doubt that to have been its intention), we decline to follow it.
Our conclusion that the Council's picketing is not proscribed by § 8(b) (7) (C) is buttressed by still another source of authority which is central to this case: § 8(e) of the Act. Section 8(e), as interpreted by the courts, carves out from the "hot cargo" provisions of the Act a special rule for the building trades which expressly recognizes the validity of building trades agreements requiring that a contractor subcontract work only to employers who have executed current agreements with the local craft unions having jurisdiction over the work performed by their employees. See National Woodwork Mfgrs. Assoc. v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). The Third Circuit has expressly held that coercive activity, otherwise illegal in other industries, may be employed to obtain a subcontractors agreement. Essex County District Council etc. v. NLRB, 332 F.2d 636 (3d Cir. 1964). See also NLRB v. Northeastern Indiana Bldg. & Construction Trades Council of Orange County, 157 NLRB 375 (1966). We believe that a holding which would deny to the Council the right to picket for a subcontract would be at odds with the rationale of Essex. At the very least, the presence of § 8(e) in the Act casts still more doubt upon the contention that subcontractor picketing is within the parameters of § 8(b) (7) (C).
The conclusion that we reach, i. e., that picketing by the Council for a subcontractors agreement is not proscribed by § 8(b) (7) (C) is presaged by two decisions of the Board: Winwake Inc., 141 NLRB 38 (1962), and Pass Development Inc., 154 NLRB 169 (1965). These cases principally centered around § 8(b) (4) charges against the unions and councils involved because they were attempting to force the general contractor to cease doing business with nonunion subcontractors who were on a construction job in progress so as to "correct a nonunion condition." However, the auxiliary purpose of the picketing in each case was to persuade the general contractors involved to hire union subcontractors. Thus, while Winwake and Pass do not involve subcontractor picketing per se, they are generally apposite here. In both cases, the Board squarely held that the councils' actions did not violate § 8(b) (7) (C). For reasons indicated above, we are not persuaded by the Board's contention that Dallas has rendered Winwake and Pass obsolete. The Board apparently did not think those decisions to have been superseded when it entered into the stipulation to the effect that subcontractor *1086 picketing did not violate § 8(b) (7) in the Office Developers case.
We have noted (see n. 1) that, for the Board to succeed in a § 10(l) proceeding, it need not show conclusively the validity of the propositions of law underlying its charge, but only that the propositions of law which it has applied to the charge are substantial and not frivolous. We do not read § 10(l) as thus construed, to require a District Court, charged with granting injunctive relief under § 10(l) where it is "just and proper", to grant relief based upon legal theories advanced by the Board which, while thoughtfully presented and not frivolous, are, in the view of the Court, erroneous.

V. CONCLUSION
It is not for this Court to express a value judgment on the wisdom of permitting building trades councils to picket indefinitely for the purpose of securing a subcontractors agreement from a general contractor in the building industry. Such picketing can wreak major economic havoc upon a contractor and bring a major construction project to a haltas this picketing has. On the other hand, area standards picketing which has been regularly permitted by the Board and the courts, and even informational picketing, which is permitted by a proviso to § 8(b) (7) (C), can have precisely the same effect. It may be that the subcontractor picketing which thwarts the progress of Long and of the new school is an evil in terms of our national labor policy, but, if so, it is for Congress to so declare it and proscribe its use. As we read the Act, Congress has not yet done so. Hence, this Court cannot act in this matter. It is now 13 years since the Landrum-Griffin Amendments to the Act. Perhaps Congress should look again at the matter of picketing in the building trades industryat the new patterns of picketing which have developed in the interim and in furtherance of its policy-making role, enact a more comprehensive and consistent regulatory scheme than it has heretofore.
Having found that the Court has jurisdiction over the parties and the subject matter[17] but that there is no reasonable cause to believe that the actions of the Council in engaging in subcontractor picketing constitute a violation of § 8(b) (7) (C) of the Act, we conclude that it is not "just and proper," in terms of § 10(l), to grant injunctive relief.
NOTES
[1] Our judicial role in this case is limited by the principles enunciated in Schauffler ex rel. N. L. R. B. v. Local 1291, Int'l Longshoremen's Ass'n, 292 F.2d 182 (3d Cir. 1961), as follows:

"[I]t must be borne in mind that a Section 10(l) injunction is interlocutory in nature and only remains in force pending the final adjudication of the Board with respect to the unfair labor practice charge. . . . The Board need not show that an unfair labor practice has been committed, but need only demonstrate that there is reasonable cause to believe that the elements of an unfair labor practice are present. Nor need the Board conclusively show the validity of the propositions of law underlying its charge; it is required to demonstrate merely that the propositions of law which it has applied to the charge are substantial and not frivolous. . . ." (emphasis added).
[2] This Opinion constitutes our findings of fact and conclusions of law pursuant to Fed.R.Civ.Proc. 52(a).
[3] While Long regularly subcontracts certain portions of construction projects (and on projects such as East High School, State law requires the separate letting of the plumbing, heating and electrical work), it maintains a cadre of some fifty regular employees who do all of the carpentry, drywall, masonry and iron-workers work on all of its jobs and often do glass, linoleum, electrical, bricklaying and asbestos work as well. Long's work ranges from home remodeling and single home construction to a major project such as East High School. On larger jobs, major portions of the work are subcontracted.
[4] E.D.Pa.C.A. No. 71-2204.
[5] Prior to and during the hearing in this case, the Council asserted that the Board was estopped to charge it with an 8(b) (7) (C) violation in this case. The elements of the estoppel claim were: (1) that the Board's position in the Office Developers case led the Council into the belief that subcontractor picketing did not violate § 8(b) (7) (C); (2) that the Council relied thereon; and (3) that the reliance was to the Council's detriment because it thereby determined to forego other remedies available to it in the Long situation, including: (a) efforts to organize Long's employees and/or the employees of the eight non-union subcontractors on the East High School job; and (b) picketing to compel Long to comply with area standards with respect to wages and conditions of employment. However, in its post-hearing brief, the Council did not press the estoppel argument.

The Board denies that it ever committed itself to the position that subcontractor picketing does not violate § 8(b) (7) (C). It reads the Office Developers stipulation in a manner different from the Council and points out that the stipulation was the vehicle for the settlement of the Office Developers litigation and that no precedent can accordingly be drawn therefrom. In any event, even if we found facts amounting to an estoppel, which we do not, as a matter of law there can be no estoppel against the Board, NLRB v. Laister-Kauffman Aircraft Corp., 144 F.2d 9 (8th Cir. 1944), or against the United States, 31 C.J.S. Estoppel § 140 n. 59.10, p. 691.
[6] The proposed agreement applies only to work performed in the five counties under the Council's jurisdiction.
[7] See Local 346 International Leather Goods Union v. Compton, 292 F.2d 313 (1st Cir. 1961); Department and Speciality Store Employees' Union v. Brown, 284 F.2d 619 (9th Cir.), cert. denied, 366 U.S. 934, 81 S.Ct. 1659, 6 L.Ed.2d 846 (1961); Joiner, Inc., 135 NLRB 876; NLRB v. Denver Building & Construction Trades Council, (1951), 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; International Brotherhood of Electrical Workers v. NLRB, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951); Samoff v. Teamsters Local 115, 338 F.Supp. 856 (E.D.Pa.1972).
[8] It should also be noted that when Samuel E. Long, President of the company, signed an unfair labor practice charge against the Council, he stated that "the exclusive purpose of the picketing was to compel the general contractor at work on the project, Samuel E. Long, Inc., to execute a subcontractors agreement." He signed a similar affidavit in a Chester County Court of Common Pleas action. We note too that Long testified at the hearing that he understood that the subcontractors agreement would not affect his company's own employees.
[9] It should be noted that the "reasonable cause" yardstick of § 10(b) extends to all elements of the case. Madden v. International Organization of Masters, Mates & Pilots, 259 F.2d 312 (7th Cir.), cert. den. 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 229 (1958).
[10] See also Winwake Inc., 141 NLRB 38 (1962) and Pass Development Inc., 154 NLRB 169 (1965), where on facts similar to the case at bar, trade councils were assumed to be labor organizations (the question was not raised).
[11] Magnavox and Monsanto were also distinguished by the Board in the International Brotherhood of Electrical Workers case (St. Louis council case), supra.
[12] In 1959, Congress enacted the Labor Management Reporting and Disclosure Act (Landrum-Griffin Act), 29 U.S.C. § 401 et seq. and specifically included joint councils within the definition of labor organizations. The Council argues that the failure of Congress to amend § 2(5) at the same time indicates an intention to exclude councils from its orbit We find this argument to be unpersuasive.
[13] § 8(b) (7) (C) contains an "informational picketing" proviso. However, the parties agree that the proviso is inapplicable in this case.
[14] At the hearing, the Board made an initial attempt to demonstrate that a subcontractors agreement would have a direct effect upon the terms and conditions of employment of Long's own employees but was unsuccessful. The Board did not pursue the point thereafter.
[15] Gerhard P. Van Arkel, former General Counsel, NLRB.
[16] Our conclusion is unaffected by the holding in NLRB v. Local 542 Int'l Union of Operating Engineers, 331 F.2d 99 (3d Cir. 1964) in which the court held that picketing of an employer by a union to force the employer to recognize and bargain with the union violated § 8(b) (7) (C) even though at the time of the picketing the employer did not employ any operating engineers for the union to represent, so that a § 9(c) petition could not be filed. In that case, it appeared that the employer might well in the future resume hiring operating engineers (it was subcontracting that type of work during the period of the litigation), and the Board found that it was for that reason that the union sought recognition. In fact, though the employer had not employed operating engineers since 1957, the union had seen fit to enter into written collective bargaining agreements with the employer until the contract expired. These facts clearly distinguish Operating Engineers from the present case where the record supports the Council's conclusion that it is in no position to (and has no intention of) seeking representative status. The court, enforcing the Order of the Board, also reasoned that to allow indefinite picketing in the case which would license a union's use of coercion upon an employer to sign a pre-hire agreement where the majority status of the union could not be established by an election would run contrary to the purpose of the Act.
[17] The parties have stipulated the essential jurisdictional facts.