**NORTHEASTERN INDIANA BUILDING AND CONSTRUCTION TRADES COUNCIL et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 19164.

United States Court of Appeals District of Columbia Circuit.

Argued June 11, 1965.

Decided July 28, 1965.

Mr. Bernard M. Mamet, Chicago, Ill., with whom Mr. James F. Carroll, Washington, D. C., was on the brief, for petitioners.

Mr. Melvin J. Welles, Atty., N.L.R.B., with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Mrs. Linda R. Sher, Atty., N.L.R.B., were on the brief, for respondent.

Before DANAHER, BURGER and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge:

Petitioners are labor organizations who seek review of a National Labor Relations Board order finding them in violation of Section 8(b) (4) (B) of the Act, 61 Stat. 140 (1947), as amended, 29 U.S.C. § 158(b) (4) (B). The Board, in its answer, requests enforcement. Petitioners challenge the Board's action on both substantive and procedural grounds, arguing that their conduct was not illegal, and that, in any event, the Board's determination to the contrary was arrived at in a manner incompatible with applicable requirements as to notice and hearing. We do not reach the first issue, because we agree with petitioners' claims in respect of the second.

I

On September 23, 1963, petitioners started picketing at the site of an apartment construction project in Fort Wayne, Indiana. The general contractor was Centlivre Village Apartments, which employed directly various persons belonging to petitioners. Certain parts of the construction were subcontracted, and one of the subcontractors, Kimes & Kocks, did not employ petitioners' members. The pickets bore signs stating this latter fact, and representing that such employees were working for substandard wages as compared with petitioners' members. Although the signs also stated that they

were informational only and "Not Intended To Induce Anyone To Stop Working On This Project," the appearance of the pickets resulted in a closing down of substantially all work on the site. Centlivre sought a meeting with petitioners, which was held on October 8. There is some conflict among the versions of what happened at that meeting, but it is clear that Centlivre emerged from the meeting with two typewritten contract forms which it said had been handed to it by petitioners in response to its query as to what had to be done to get the pickets removed. One form of agreement was designed for use between petitioners and a general contractor, and the other between petitioners and a subcontractor. They provided in effect that only employers having labor agreements with petitioners would do work on the project. The meeting adjourned upon Centlivre's assertion that it would study the proposals. This study resulted in its filing, on October 11, of unfair labor practice charges to the effect that petitioners had violated Section 8(b) (4) (A)[1] by picketing to secure a "hot cargo" agreement of the kind banned by Section 8(e).[2]

On November 13, 1963, the Board's Regional Director issued the complaint upon which the Board's proceedings are based. This complaint charged essentially that, beginning October 8, 1963, petitioners had been picketing Centlivre's project with the object of forcing Centlivre to enter into an agreement to refrain from doing business with Kimes & Kocks or any other employer not signatory to such a contract. This picketing, for this object, was charged to be an unfair labor practice within the meaning of Section 8(b) (4) (A) and (B). At the hearing, the opening statement on behalf of the Board's General Counsel made clear that "General Counsel is not alleging any violation from the beginning of the picketing [September 23] to the meeting that you will hear testimony on [October 8]. It is only from that meeting on that we are alleging a violation." It was made equally clear that the violation claimed rested upon the appearance of the "hot cargo" agreements at the October 8 meeting and the consequent inference that the object of the picketing was to force Centlivre to enter into such an agreement.[3] The 8(b) (4) (B) violation was expressly characterized as "derivative" to the 8(b) (4) (A) charge.

The Examiner found that the "unlawful objects of [petitioners] * * * are well evidenced as a result of the October 8 meeting and of the contracts demanded in order that the picketing be stopped." He regarded the contracts as within the

---

1. Two weeks later the charges were amended to include an alleged violation of Section 8(b) (4) (B). Presumably this was in response to what appears hereinafter to have been the Board's assumption at that time that any picketing violative of 8(b) (4) (A) must of necessity violate 8(b) (4) (B).

2. A proviso to Section 8(e) purports to render its terms inapplicable in the construction industry, but, as will also be seen hereinafter, at the time in question the Board had taken the position that, even in the construction industry, picketing was illegal if its object was to secure an agreement of the kind generally proscribed by Section 8(e).

3. Counsel's full explication of the theory of his case was as follows:

MR. GROVE: General Counsel will prove by a propondrance [sic] of evidence that picketing took place in this case and there was a meeting in which the General Counsel alleges that the picketing took place on the nature of a threat to have the party, Centlivre and the other subcontractors on the job enter into a contract that is banned by Section 8(e) of the National Labor Relations Act.

And, also, we allege and will prove that there is a derivative of 8(b) (4) (b) violation of the Act if the parties did sign this contract, they would be required to cease doing business with certain of the subcontractors on the job site.

The main theory in this case is we are proceeding upon the Colson and Stevens Construction Company case, which is 137 NLRB 1650. The evidence will also show, although we are not alleging as a violation, that the contracts involved are not protected by the construction industry proviso of Section 8(b).

ban of Section 8(e) of the Act, except as the proviso in that section permits them in the construction industry *on a purely voluntary basis*. He recognized that this last-mentioned qualification is not in the statute, but represents, rather, a gloss upon it by the Board in its decision in Construction Laborers Union (Colson and Stevens Constr. Co.), 137 N.L.R.B. 1650 (1962), where it was held that picketing to secure a "hot cargo" agreement is illegal, even in the construction industry. Describing himself as "bound by the Board's decision in *Colson and Stevens*," the Examiner found a violation of Section 8(b) (4) (A), and, derivatively, of Section 8(b) (4) (B).

The Board took a different tack. It noted that its *Colson and Stevens* order had been set aside by the Ninth Circuit (Construction Laborers Union v. NLRB, 323 F.2d 422 (9th Cir. 1963)), and that two other Courts of Appeals, including this one, had rejected its *Colson and Stevens* analysis (Essex County and Vicinity Dist. Council of Carpenters v. NLRB, 332 F.2d 636 (3rd Cir. 1964); Orange Belt Dist. Council of Painters v. NLRB, 117 U.S.App.D.C. 233, 328 F.2d 534 (1964); Building and Constr. Trades Council v. NLRB, 117 U.S.App.D.C. 239, 328 F.2d 540 (1964)). It announced that, upon re-examination of the question, it had concluded to change its position and to agree with the courts at least to the extent that picketing to secure a "hot cargo" contract in the construction industry is not a violation of Section 8(b) (4) (A). Accordingly, it dismissed "that portion of the complaint which alleges a violation of that section of the Act."

It went on, however, to sustain the Examiner's finding of a violation of Section 8(b) (4) (B). This violation having been, in the Examiner's view, simply an automatic derivative from the 8(b) (4) (A) violation, the Board felt it necessary to say that "we do not adopt the Trial Examiner's rationale, which was based on decisions we have now overruled, but rest our decision on our finding that the picketing had *as one of its objects* forcing or requiring Centlivre to cease doing business with Kimes & Kocks   *   *   *." (Emphasis supplied.) It purported to find in the record ample evidence to establish this object, as well as the one of forcing the execution of "hot cargo" contracts. It said that the mere fact that it had now decided to reverse itself and to regard the latter object as legal did not render simultaneous pursuit of the other object any less illegal.

Petitioners, before seeking review here, moved the Board for reconsideration, asking, alternatively, that the complaint be dismissed in its entirety, or that the order be vacated with a remand to the Regional Director for the issuance of a new complaint containing independent Section 8(b) (4) (B) allegations and for the taking of additional testimony. The Board denied the motion.

## II

In its decision the Board proclaimed its purpose to continue to find a violation of Section 8(b) (4) (B) in those cases where picketing, although addressed to the newly-legal object of securing "hot cargo" contracts, is also shown by the evidence to have the additional object of causing "a cessation of business between a neutral general contractor and an existing and identified nonunion subcontractor." As indicated above, we do not find it necessary, for the disposition we make of this review proceeding, to explore or to express an opinion about the merits of this position. What we do hold is that the Board erred in electing to apply it in this case.

The scheme of the statute is that the conduct identified in Section 8(b) (4) is or is not illegal, depending upon its object. To allege a violation it is necessary to specify the object of the challenged activity. We think it beyond cavil that this complaint alleged only the object defined in Section 8(b) (4) (A), namely, to secure the execution of an illegal agreement. If picketing for this object was proved, Section 8(b) (4) (A) was, in the then state of the law as laid down by the Board, violated; and a violation premised upon that theory carried with it ineluc-

tably a derivative violation of 8(b) (4) (B). The General Counsel stated on the record that this was the case—and the only case—he proposed to prove. The Trial Examiner stated in his report that he was bound by the Board's decision in *Colson and Stevens* to find against petitioners on that theory of what was charged and what was proved. It was only after petitioners had responded to this charge and this proof—and after the record was closed—that the Board decided to jettison *Colson and Stevens* but to hold against petitioners on an admittedly new and different theory. It denied petitioners' request that, at the least, the matter be remanded for further hearings on a complaint charging the new object. This is not, either in our view or, more importantly, that of Congress,[4] the way to go about unveiling a new and altered construction of the Act.

The Board now justifies this handling of the matter principally upon the ground that petitioners were not prejudiced since they "were not precluded from raising any available defenses." This is a curious ratiocination when one pauses to reflect that these "defenses" relate to a charge that was not made. It is also said that there can be no prejudice because the Board had the benefit of petitioners' brief in support of their motion for rehearing. When what that brief urged as a minimum measure of relief was the necessity of a new hearing to take evidence on a new charge, the force of the Board's point in this regard is, at best, elusive.

If, on the new theory, petitioners were violating Section 8(b) (4) (B) by their picketing after the October 8 meeting, they would seem to have been violating it before that meeting and throughout the period from the inception of the picketing on September 23. But the complaint limited its accusations to the period after October 8, and trial counsel for the Government expressly disclaimed any assertion of illegality prior to October 8. We think petitioners were entitled to assume that they had only to defend against a charge that their illegal object was to secure illegal contracts. They were found guilty by the Board of entertaining an entirely different object.

The Board now says that no harm was done because petitioners presumably would not have defended themselves any differently. But this is a speculation we do not indulge. Lawyers customarily try cases by reference to the issues framed in the pleadings in advance of hearing, and not in anticipation of new issues which possibly may be announced by the court in its opinion. The Board not having been disposed to remand this matter for further hearings upon petitioners' request, we feel no compulsion to do so ourselves. A considerable amount of time has elapsed since the events occurred which gave rise to this proceeding, and we are inclined to think that the merits of the Board's post-*Colson and Stevens* ap-

4. The authority to issue complaints resides in Section 10(b) of the Act, which refers to "a complaint stating the charges" in respect of what is claimed to be an unfair labor practice. Judge Medina has characterized the Congressional purpose in this regard in these terms, Douds v. International Longshoremen's Ass'n, 241 F.2d 278, 283 (2d Cir. 1957):

The complaint, much like a pleading in a proceeding before a court, is designed to notify the adverse party of the claims that are to be adjudicated so that he may prepare his case, and to set a standard of relevance which shall govern the proceedings at the hearing. * * *

This purpose is amplified in the Administrative Procedure Act (see Sections 5(a) (3) and 5(b) (1), 60 Stat. 239, 5 U.S.C. § 1004 (a) (3) and (b) (1)), and is reflected in the Board's own formulation of procedural policies. See also NLRB v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682 (1939); NLRB v. Johnson, 322 F.2d 216 (6th Cir. 1963), cert. denied *sub nom.* Taylor v. Johnson, 376 U.S. 951, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964); NLRB v. Threads, Inc., 308 F.2d 1 (4th Cir. 1962); International Union of Elec. Workers v. NLRB, 110 U.S.App.D.C. 91, 289 F.2d 757 (1960); NLRB v. Kanmak Mills, Inc., 200 F.2d 542 (3rd Cir. 1952); NLRB v. Bradley Washfountain Co., 192 F.2d 144 (7th Cir. 1951).

proach can best be explored, with the maximum of fairness both to the Board and to the respondent, in a setting where that approach can be asserted from the first.

The case is remanded to the Board with directions to set aside its order and to dismiss the complaint.

It is so ordered.

DANAHER, Circuit Judge (concurring):

I quite agree with most of Judge McGowan's cogent discussion and certainly with his conclusion that the complaint should be dismissed, but I reach that result on a different basis. It seems to me the Board is simply *saying* it has changed its position with respect to its decision in Colson and Stevens Construction Co., 137 NLRB 1650. At the same time, the Board here has come out exactly where we find it as if the *Colson and Stevens* order had never been set aside. The Board rests upon its finding "that the picketing had as one of its objects" that of coercion of Centlivre Apartments to refrain from doing business with one of the subcontractors, Kimes and Kocks.

In other words, the Board was here holding that the petitioner might lawfully try to procure a promise in writing that the contractor would cease doing business with the subcontractor, but that it is unlawful for the petitioner to have the intention of enforcing that promise. The Board thus would skirt the decisions cited by Judge McGowan which rejected the Board's *Colson and Stevens* doctrine.

The case was tried on the theory then held by the Board that the picketing was illegal if its object was to secure a "hot cargo" agreement even in the *construction* industry. When that premise disappeared, so did the complaint.

I think the Board should have faced up to the merits. In that approach the Board would have been required to grant the petitioner's motion for reconsideration on the alternative ground, and thus to have dismissed the complaint.