**Sidney DANIELSON, Regional Director of Region 2 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner-Appellee,**

v.

**JOINT BOARD OF COAT, SUIT AND ALLIED GARMENT WORKERS' UNION, I.L.G.W.U., Respondent-Appellant.**

**No. 714, Docket 73-2813.**

United States Court of Appeals, Second Circuit.

Argued Jan. 17, 1974.

Decided Feb. 27, 1974.

Emil Schlesinger, New York City (Schlesinger, Schlesinger & Schlesinger, New York City, of counsel), for appellant.

Marvin Roth, Deputy Asst. Gen. Counsel, N. L. R. B., Washington, D. C. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Gerald Brissman, Associate Gen. Counsel, Jack D. Eisenberg, N. L. R. B., Washington, D. C., of counsel), for appellee.

Before FRIENDLY and MANSFIELD, Circuit Judges, and ZAMPANO, District Judge.*

FRIENDLY, Circuit Judge:

This appeal from an order of the District Court for the Southern District of New York granting an injunction against picketing on a petition of the Regional Director of the Labor Board under § 10(l) of the National Labor Relations Act raises important questions concerning the interpretation of §§ 8(b)(4), 8(b)(7), and 8(e) of the National Labor Relations Act and the standard governing the issuance of injunctions under § 10(l).

## I.

The facts are simple and largely undisputed: Hazantown, Inc., a New York corporation, is engaged in the business of importing and arranging for the manufacture of women's garments. As a "jobber" in the manufacturing process, Hazantown follows the predominant pattern of the New York garment industry. It purchases raw materials from suppliers, delivers them to contractors who manufacture garments according to Hazantown's specifications, and upon redelivery sells the garments to retail establishments. Because of this method of operation, Hazantown maintains only about seven employees, primarily shipping clerks and office workers.[1]

On September 12, 1973, agents of the Joint Board of Coat, Suit and Allied Garment Workers' Unions, I.L.G.W.U., visited Hazantown and requested it to sign the Joint Board's standard jobber's agreement. This agreement between the union and the jobber, characterized as "the Employer," regulates many terms and conditions of employment of the workers in the shops of contractors, but expressly states that it "shall not be applicable to any workers employed by the Employer on his own premises or in his inside shop whether the same is located on his premises or elsewhere." With respect to employees of contractors, the agreement deals with a great variety of subjects. Summarily stated, it provides for the fixing of piece rates; requires the jobber to provide and pay the full cost of disability benefits established by law of the State of New York; makes the jobber responsible for the payment of semi-annual work bonuses and re-

---

* Of the District Court for the District of Connecticut, sitting by designation.

1. There is some dispute about just how many employees Hazantown has, and precisely what they do. However, at the evidentiary hearing before Judge Gurfein, Hazantown's president conceded that none of his employees was engaged in the manufacture of garments.

quires contributions to a trust fund established to that end; requires the jobber to pay the contractor an amount sufficient to cover the compensation for workers provided in contracts between the contractor and the union, plus a reasonable amount to cover overhead and services in order to insure against diversion of the monies paid for compensation; makes the jobber liable, to a limited extent, for defaults by contractors in paying compensation to the contractors' employees; authorizes the union to have a representative visit the jobber's premises to take up complaints and to examine his books and records to determine if he is complying with the terms of the agreement; requires the jobber to make payments to the benefit funds of the union, based on the gross payments the jobber makes to his contractors; prohibits the jobber from engaging contractors not under contract with the union and from selling or handling any garments not manufactured by a union contractor; forbids him to give any work to a contractor who has been struck by or is having a labor dispute with the union; prohibits him

from dealing with contractors who obtain any garment accessories or services from nonunion contractors; and requires him to confine his production as regards contractors to only as many as he actually needs to produce his garments, all such contractors to be designated to and approved in advance by the union.[2]

Hazantown rejected the demand of the union agents. On September 17 the union began picketing Hazantown at the building in which it was located. The picket signs said:

Strike

Hazantown, Inc.

Mary Allen Payne

followed by the name of the union.[3] No Hazantown employees participated in the picketing or engaged in a strike. On October 16 Hazantown filed with the Labor Board a charge that the union had engaged in an unfair labor practice within § 8(b)(7)(C).[4] Two days later the union wrote Hazantown, confirming that it did not seek to represent any of

---

2. The union also reserved the right to disapprove any contractor at any time if the contractor failed to abide by its agreement with the union. Upon the union's disapproval, the jobber would be required to discontinue his relationship with the contractor in favor of one sanctioned by the union.

3. Mary Allen Payne is a holding company for Hazantown.

The General Counsel has made no point concerning the ambiguous and possibly misleading nature of the sign; doubtless this could have been cured by negotiation.

4. This makes it an unfair labor practice for a labor organization

(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

(C) where such picketing has been conducted without a petition under section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Provided*, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 9(c)(1) or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided, further*, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

Hazantown's own workers (explaining that "As a matter of fact, our Union does not have jurisdiction over shipping clerks and receptionists, bookkeepers, or secretaries"), and that its sole desire was to obtain from Hazantown "a jobber's agreement under which your firm would obligate itself to send work to, or deal only with, Union contractors, i. e., contractors whose employees are already represented by our Union." Shortly thereafter the Regional Director filed a petition alleging that he had reasonable cause to believe that the company's § 8(b)(7) charge was true and seeking an injunction under § 10(*l*).

After a brief evidentiary hearing the district judge found that the union's purposes were as stated in its letter of October 18. He had no difficulty in distinguishing Dallas Building & Construction Trades Council v. NLRB, 130 U.S.App.D.C. 28, 396 F.2d 677 (1968), on which the General Counsel heavily relied—nor, as will be seen below, do we. He was "inclined to think that this kind of picketing in the garment industry comes within the policy exemption provided by the Congress in Section 8(e) as it is a logical concomitant to protect its own workers, as well as complying competitors in an industry so structured." However, he read our decisions construing § 10(*l*) as limiting him in effect to determining whether the Regional Director's conclusion that an unfair labor practice had been committed was more

than frivolous, and whether there was some harm justifying issuance of a temporary injunction. Finding, as is not disputed, that the picket line had induced truckmen not to deliver goods to Hazantown and that Hazantown's business was seriously affected, he issued an injunction pending final adjudication by the Board of the unfair labor practice charge which the General Counsel had filed.

The union appealed and sought an expedited hearing and a stay. Upon our indicating willingness to grant the former, counsel cooperatively withdrew his request for the latter pending determination of the appeal.

## II.

Unless the hearing on the complaint later filed by the General Counsel should develop facts or points of law differing substantially from those presented to the district judge and to us, we would decline to enforce an order finding that the union had violated § 8(b)(7)(C).[5] For reasons to be discussed, we think such an order would fly in the face of what Congress intended in enacting the garment industry proviso in 1959. The proviso, which is a part of § 8(e), the prohibition of "hot-cargo" agreements,[6] reads:

*Provided further,* That for the purposes of this subsection (e) and sec-

---

5. After argument in this case, we were informed that the Administrative Law Judge in the unfair labor practice proceeding had held that the union was guilty of violating § 8(b)(7)(C). The judge apparently did not accept the General Counsel's primary theory —that picketing the jobber's premises to obtain a clause that prohibits subcontracting to nonunion contractors was, in itself, a violation of the Act. Instead, he found that under the terms of the union's proposed subcontracting agreement, Hazantown would have been required to "bargain with the Union about the [contractors'] employees' conditions of employment," and that picketing to that end was proscribed by § 8(b)(7)(C).

6. As is well known, the body of § 8(e) was intended to overrule, for industry in general,

the holding of Local 1976, United Bhd. of Carpenters & Joiners v. NLRB (Sand Door), 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958), that under previous legislation such agreements were not in themselves illegal although certain types of efforts to enforce them were.
The full text of § 8(e) is as follows:
(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter

tion 8(b)(4)(B) the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry.

The development of the unique structure of the garment industry, particularly in New York City, was well described by Judge Weinfeld in Greenstein v. National Skirt & Sportswear Ass'n, Inc., 178 F.Supp. 681, 687–688 (S.D.N.Y. 1959), appeal dismissed, 274 F.2d 430 (2 Cir. 1960). While the cited pages of the opinion can be read to advantage, their nub is as follows: Garment manufacturers, in an effort to avoid unionization, largely abandoned their "inside shops,"

transformed themselves into jobbers, and then engaged contractors to do the actual manufacturing. "The jobber had no direct dealing with employees, was not responsible to them for wages, and was unconcerned with hours and adequate standards. . . . The contractors were in fierce competition with one another for the patronage of jobbers and inside manufacturers. The essential basis of this intense competition was reduced labor costs. The brunt of this economic rivalry was borne by the workers and reflected itself in depressed wages and substandard labor conditions." Since unionization of one contractor would be ineffective if the jobber could turn to a non-union competitor, the weapon developed by the union to meet this was to require the jobber to agree to deal only with unionized contractors.

A possible problem concerning the consistency of the union's practice with § 8(b)(4) of the National Labor Relations Act as amended [7] was posed in

containing such an agreement shall be to such extent unenforcible and void: *Provided,* That nothing in this subsection (e) shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: Provided further, That for the purposes of this subsection (e) and section 8(b)(4)(B) the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further,* That nothing in this Act shall prohibit the enforcement of any agreement which is within the foregoing exception.

7. Section 8(b)(4), which was amended in 1959, now reads as follows:
(b) It shall be an unfair labor practice for a labor organization or its agents—

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is:
(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by section 8(e);
(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful,

1949 on the floor of the Senate when that body was considering Senator Taft's proposed amendments to the newly-enacted Taft-Hartley Act. This took the form of a colloquy which counsel for the union tells us, with refreshing candor, he caused to be staged between Senator Ives of New York and Senator Taft, 95 Cong.Rec. 8709 (June 30, 1949). After recounting the structure of the garment industry, Senator Ives described a hypothetical organizational drive in which "the union may attempt to persuade the jobber's workers not to design or to cut goods to be manufactured in the shops of the nonunion contractors," substantially the present case, "or the union may try to persuade the contractor's workers not to manufacture dresses for a nonunion jobber." He inquired whether Senator Taft agreed "that it was never the intention of Congress to have the secondary boycott provisions of the act apply to this situation." Senator Taft did agree. The ban on secondary boycotts, he stated, "is merely intended to prevent a union from injuring a third person who is [not] involved in any way in the dispute or strike, and therefore should not suffer economic damage simply because of the action of a labor union. It is not intended to apply to a case where the

third party is, in effect, in cahoots with or acting as a part of the primary employer."

When the Landrum-Griffin bill, which modified § 8(b)(4), was under discussion by the House of Representatives in 1959, counsel for the union caused the Ives-Taft colloquy to be replayed in questions by Representative Teller of New York to Representatives Landrum and Griffin. 105 Cong.Rec. 14508–09 (Aug. 13, 1959), *reprinted in* 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 1680–81. Both accepted Senator Taft's interpretation. The prospective enactment of § 8(e) and, possibly, other considerations led representatives of the garment workers union to feel that something more was needed. The result was the garment industry proviso which we have quoted. As Senator Javits noted during debate, the proviso was intended to permit the I.L.G.W.U. to continue "present unionization practices throughout the integrated production process" without being hampered by the Landrum-Griffin Act. 105 Cong.Rec. 16428 (Sept. 3, 1959), *reprinted in* 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 1446.

where not otherwise unlawful, any primary strike or primary picketing;

(C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 9;

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certificate of the Board determining the bargaining representative for employees performing such work:

*Provided,* That nothing contained in this subsection (b) shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees

of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this Act: *Provided further,* That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution.

The garment industry proviso differs significantly from the construction industry proviso which precedes it. That proviso states: "That nothing in this subsection (e) shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work." Since the construction industry proviso contains no reference to § 8(b)(4), it has been read to allow striking and picketing to obtain an agreement regulating subcontracting at the job site,[8] but not to authorize the use of economic weapons to enforce an agreement once obtained. Construction, Production & Maintenance Laborers, Local 383 v. NLRB, 323 F.2d 422 (9 Cir. 1963); Orange Belt District Council of Painters No. 48 v. NLRB, 117 U.S.App. D.C. 233, 328 F.2d 534, 537 (1964); Essex County & Vicinity District Council v. NLRB, 332 F.2d 636, 640–641 (3 Cir. 1964); NLRB v. IBEW, Local 683, 359 F.2d 385, 386 (6 Cir. 1966); NLRB v. Local 445, 473 F.2d 249, 253 (2 Cir. 1973). In contrast, because of the reference to § 8(b)(4) in the garment industry proviso, secondary picketing is clearly permissible in cases within its ambit, see Construction, Production & Maintenance Laborers, Local 383 v. NLRB, supra, 323 F.2d at 425. Until now there has been virtually no litigation with respect to picketing in the garment industry,[9] and the General Counsel's representative at argument conceded that the present case was a new departure.

Not disputing any of this, the General Counsel contends that the proviso does not modify § 8(b)(7)(C). This is true enough in the abstract; if the union were attempting to organize the employees of Hazantown, nothing in the proviso would entitle it to picket without filing a petition under § 9(c) within thirty days. But the union made clear and the district judge found that the union had no intention or desire of doing anything of the sort. It may well be, as the General Counsel contends, that a union which is demanding changed terms or working conditions for employees of a jobber cannot escape § 8(b)(7)(C) simply by disclaiming an intention to represent them. Compare Centralia Building & Construction Trades Council v. NLRB, 124 U.S.App.D.C. 212, 363 F.2d 699, 701 (1966); Dallas Building & Construction Trades Council v. NLRB, supra, 396 F. 2d at 683. But, here again, the union was doing nothing of the sort; the jobber's agreement it was trying to force on Hazantown expressly provided that the contract did not apply to Hazantown's employees. While those employees were entitled to bargain to prohibit or limit the amount of subcontracting, Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L. Ed.2d 233 (1964), nothing in the jobber's agreement would prevent this. Although the agreement would restrict their future freedom to bargain about the *terms* of subcontracts, *e. g.*, by insisting that Hazantown should *not* use

---

8. Even this would seem to go beyond the strict letter of the narrow construction industry proviso, as the Board initially held, Colson & Stevens Constr. Co., 137 N.L.R.B. 1650 (1962). However, after several reversals in the courts of appeals, the Board revised its stance to hold that economic coercion to *obtain* a subcontracting clause was permissible, Centlivre Village Apartments, 148 N.L.R.B. 854 (1964), remanded on another ground sub nom. Northeastern Indiana Bldg. & Constr. Trades Council v. N. L. R. B., 122 U.S.App.D.C. 220, 352 F.2d 696 (1965).

9. A leading textwriter, not anticipating the General Counsel's present effort, wrote only three years ago, "Inasmuch as the [garment industry] exemption is an absolute one (whereas the construction industry exemption is limited), there is no room for disagreement as to the meaning of the proviso; consequently, no litigation has resulted." Morris, The Developing Labor Law 674 (1971). The General Counsel has provided some aid in construing the exemption, ruling that it is legal for a union and jobber to agree that the jobber will utilize only unionized contractors. 46 L.R.R.M. 1502 (1960).

union subcontractors since this might increase costs to such a degree as to force a curtailment of Hazantown's "manufacturing" operations, this is so wholly theoretical as to stretch the words "forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees" beyond the breaking point.

The further argument that, because the agreement forces a jobber to do many things for the benefit of a contractor's employees, the jobber becomes a co-employer of the latter, thus triggering § 8(b)(7)(C) since the union was interested in organizing the employees of contractors, is likewise unpersuasive.[10] The General Counsel's representative here concedes that the General Counsel has formally ruled that "nothing in the proviso or in Section 8(b)(7), either explicitly or contained in the legislative history was deemed to warrant a conclusion that the relationship between a 'jobber' and a 'contractor' in the garment industry is that of a single employer for the purposes of Section 8(b)(7)," Case No. 2–CP–498 (Nov. 14, 1973). The contractors' employees do not become "employees" of the jobber in any traditional sense; they are in no way the subjects of "blackmail picketing" as is the case in ordinary § 8(b)(7)(C) violations; and the impact of the agreement upon the jobber's true employees would not be significantly greater than the impact of a simple union subcontracting clause. While the agreement's extensive prescriptions of terms and conditions of employment of the contractor's employees would doubtless cause picketing of the contractor to

force him to sign such an agreement to be in violation of § 8(b)(7)(C) as, indeed, would be the case with a simpler agreement providing only for a union shop, this does not make picketing of the jobber a violation.

What the General Counsel is attempting here is to employ a strained and wholly unnatural construction of § 8(b)(7)(C) in order to produce a result contrary to that which Senator Taft had assured was not intended by the secondary boycott provisions of the Taft-Hartley Act and Representatives Landrum and Griffin had assured was not intended by the similar provisions of the 1959 amendments which they sponsored. The garment industry proviso to § 8(e) subsequently developed was intended to strengthen the assurances so given, not to weaken them. A court should require clear language or legislative history to support a conclusion that the 1959 Congress intended § 8(b)(7)(C), which was added mainly to prevent "blackmail picketing," see Dallas Building & Construction Trades Council v. NLRB, *supra*, 396 F.2d at 680; 105 Cong.Rec. 5952, 13092, 16426, *reprinted in* 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, at 1175, 1523, 1444, to deprive the garment workers' unions of the strongest weapon in their armory and to leave them free only to picket contractors whom they had already organized;[11] we find neither. In sum, the General Counsel's effort to stretch § 8(b)(7)(C) to prevent a garment workers union from non-organizational picketing of a primary employer, although the proviso to § 8(e) was designed to permit it to picket a sec-

10. We see no force in the General Counsel's reference to NLRB v. International Union of Operating Engineers, 331 F.2d 99, 105–107 (3 Cir. 1964), holding that § 8(b)(7)(C) is applicable even when an employer has no employees but the union endeavors to force him to sign an agreement recognizing the union. This falls well within the primary objective of the section, namely, to prevent "blackmail" picketing to force recognition when a union cannot establish its majority status at an election. Here the union has

not sought and does not want recognition by the jobber.

11. Recognitional picketing of unorganized contractors clearly would be subject to § 8(b)(7)(C), as indicated above. Picketing of unionized contractors to prevent them from dealing with jobbers who had not signed the jobbers agreement would be ineffective so long as there was an adequate supply of unorganized contractors.

ondary one, would indeed keep the word of promise to the ear but break it to the hope. The time when courts would construe a statute that way has long since passed. It is apt here to recall Mr. Justice Holmes' well-known observation in Johnson v. United States, 163 F. 30, 32 (1 Cir. 1908), "it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before."

With this background, we turn to the decisions principally relied on by the Board to support its concededly novel application of § 8(b)(7)(C)—Dallas Building & Construction Trades Council v. NLRB, *supra*, 396 F.2d 677; Lane-Coos-Curry-Douglas Counties Building & Construction Trades Council v. NLRB, 415 F.2d 656 (9 Cir. 1969); and Samuel E. Long, Inc., 201 N.L.R.B. No. 42, enforced without opinion sub nom. NLRB v. Building & Construction Trades Council, 485 F.2d 680 (3 Cir. 1973).

Both *Dallas* and *Lane-Coos-Curry-Douglas*, which followed it over a vigorous dissent, involved the Board's condemnation of picketing alleged to violate § 8(b)(7)(A), which makes recognitional picketing an unfair labor practice,

(A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under section 9(c) of this Act.

In both cases a council representing a number of unions in the building trades picketed general contractors, whose employees were already organized, in an effort to force the general contractors to sign an agreement against subcontracting to subcontractors who did not have union agreements. The courts sustained the Board, broadly on the ground that the councils were seeking to superimpose an added term upon a collective bargaining agreement already made between the contractor and a union representing his employees. As Judge McGowan pointed out in *Dallas*, 396 F.2d at 681, the association representing the general contractors had "already bargained with several of the local craft unions for the omission of subcontracting clauses from their agreements," making concessions of other sorts.[12] The court held that members of the association "should be shielded from coercion on a second front by an organization with which they have no obligation to bargain." Quite apart from the point that the garment industry proviso refers to § 8(b)(4) whereas the construction industry proviso does not, we fail to see how *Dallas* assists the Board in a situation where the picketed employer had not previously bargained with anyone. Indeed, the court stated, 396 F.2d at 682 n. 8, apparently in accord with the Board's own presentation:

> Moreover, even picketing is permissible if the coverage of the proposed contract is limited to the type of work which is never performed by the general contractors' own employees.[13]

That is the situation here. Hazantown's employees had never performed the type of work covered by the proposed jobber's agreement, and the agreement made clear that it was to have no application in the unexpected event that Hazantown should change its policies and manufacture garments in an inside shop. While the quoted statement was made in the

---

12. The majority in *Lane-Coos-Curry-Douglas* similarly noted the Board's finding "that several of the provisions of the proposed contract related to subjects already covered by the collective bargaining agreements between themselves [the general contractor] and locals of the Laborers' and the Carpenters' Unions and would have modified the terms of the latter agreements." 415 F.2d at 659.

13. See also the discussion, 396 F.2d at 680, where the court points out that "there are some types of work, laboring and millwrights' work, for example, which the general contractors sometimes subcontract and sometimes perform with their own employees." This is not the case with Hazantown or in the garment industry generally.

context of § 8(b)(7)(A), it is *a fortiori* applicable to § 8(b)(7)(C).

The *Long* case, the only one of the three under § 8(b)(7)(C), provides the General Counsel no greater comfort, at least so far as the merits are concerned. When the matter came before the district court on an application under § 10(*l*), the court found no merit in the General Counsel's position that a trade council violated § 8(b)(7)(C) by picketing a unionized general contractor to obtain an agreement to subcontract only with unionized firms, Samoff v. Building & Construction Trades Council, 346 F.Supp. 1071 (E.D.Pa.1972). The Third Circuit's reversal, 475 F.2d 203 (3 Cir.), vacated and remanded for mootness, 414 U.S. 808, 94 S.Ct. 151, 38 L.Ed.2d 44 (1973), was based solely on the court's narrow view of the permissible scope of a district court's inquiry in a § 10(*l*) proceeding—the subject of Part III of this opinion. In the unfair labor practice proceeding, the Administrative Law Judge sustained the General Counsel's theory, although carefully limiting his holding to a case in which the employer's own employees could have done the work that was the subject of the proposed subcontracting agreement. The Board affirmed the Administrative Law Judge's rulings, but placed its decision on a second ground as well, finding that on the facts an objective of the picketing was to organize employees of the contractor. 201 N.L.R.B. No. 42, at 2–3. The court of appeals doubtless relied on the Board's express factual finding of

an organizational purpose, as it seems highly unlikely that, in the face of the district judge's considered opinion in the § 10(*l*) case, it would have granted enforcement without opinion had it intended to embrace the General Counsel's new interpretation of § 8(b)(7)(C).

We therefore think the district judge was right in concluding that if the Board should decide, in the pending unfair labor practice case, that the union had violated § 8(b)(7)(C), which we are by no means sure it will, the order would not be enforced unless some new facts or legal theories should appear.

### III.

The General Counsel contends that even if this be so, the district court was bound under § 10(*l*) [14] to issue the injunction unless it was willing to characterize his contentions as insubstantial and frivolous. This position is based on construing "reasonable cause to believe" in the second sentence of § 10(*l*) as meaning "non-frivolous cause to believe" and on reading the third sentence to make the district court a rubber-stamp subject only to the existence of some ground for equitable relief, which almost always will exist in a picketing case. Although we concede that Schauffler v. Local 1291, International Longshoremen's Ass'n, 292 F.2d 182, 187–188 (3 Cir. 1961), gives some color to this view and the same court's recent decision in *Samoff, supra,* 475 F.2d at 206–207, gives more, we do not believe our deci-

14. This reads in relevant part as follows:

(*l*) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 8(b), or section 8(e) or section 8(b)(7), the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he

shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law.

**1240**

sions have gone that far and we see no reason to extend them.[15]

Consideration of the problem should begin with Mr. Justice Douglas' classic opinion in Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944), a decision of such widely recognized significance that it is not unreasonable to attribute knowledge of it to at least some of the framers of the Taft-Hartley Act of 1947 in which §§ 10(j)[16] and (l) originated. The Court was there dealing with § 205(a) of the Emergency Price Control Act of 1942, 56 Stat. 23, which read:

> Whenever in the judgment of the Administrator any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of section 4 of this Act, he may make application to the appropriate court for an order enforcing compliance with such provision, and upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order shall be granted without bond.

Although the district court had permissibly found, 49 F.Supp. 528 (D.D.C.1943), that Hecht Company's violations had occurred unintentionally and that, once they had been brought to light, the company had corrected them and taken vigorous steps to prevent recurrence, a divided court of appeals had reversed the district for refusing to issue an injunction, 78 U.S.App.D.C. 98, 137 F.2d 689 (1943), on the ground that once violations had been found, issuance of an injunction was mandatory since the statute said it "shall be granted." The Supreme Court reversed. The pertinent portion of the opinion merits quotation, 321 U.S. at 329–330, 64 S.Ct. at 591 (emphasis in original):

> A grant of *jurisdiction* to issue compliance orders hardly suggests an absolute duty to do so under any and all circumstances. We cannot but think that if Congress had intended to make such a drastic departure from the traditions of equity practice, an unequivocal statement of its purpose would have been made.

We do not stop to compare the provisions of § 205(a) with the requirements of other federal statutes governing administrative agencies which,

15. Courts in most of the circuits have adopted the "reasonable cause to believe" standard for granting 10(l) injunctions, although usually without elaboration. See, e. g., Sachs v. Local 48, Journeymen & Apprentices, 454 F.2d 879, 883 (4 Cir. 1972); Retail, Wholesale & Department Store Union v. Rains, 266 F.2d 503, 505 (5 Cir. 1959) (probable cause); AFTRA v. Getreu, 258 F.2d 698, 699 (6 Cir. 1958); Cosentino v. United Bhd. of Carpenters, 265 F.2d 327, 330 (7 Cir. 1959); Madden v. International Hod Carriers' Union, 277 F.2d 688, 690 (7 Cir.), cert. denied, 364 U.S. 863, 81 S.Ct. 105, 5 L.Ed.2d 86 (1960); Local Joint Board, Hotel & Restaurant Employees v. Sperry, 323 F.2d 75, 77 (8 Cir. 1963). The Ninth Circuit has expressly adopted the "insubstantial and frivolous" standard of the *Schauffler* case, San Francisco-Oakland Newspaper Guild v. Kennedy, 412 F.2d 541, 544–545 (9 Cir. 1969); Kennedy v. Los Angeles Typographical Union No. 174, 418 F.2d 6, 8 (9 Cir. 1969); Hoffman v. Cement Masons Local 337, 468 F.2d 1187, 1193 (9 Cir. 1972), cert. denied, 411 U.S. 986, 93 S.Ct. 2269, 36 L.Ed.2d 964 (1973). In a recent opinion dealing with an injunction under § 10(j), the Fifth Circuit approved the *Schauffler* standard for both 10(j) and 10(l) cases, Boire v. International Bhd. of Teamsters, 479 F.2d 778 (5 Cir. 1973).

16. This reads:
(j) The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

it is said, make it mandatory that those agencies take action when certain facts are shown to exist [citing National Labor Relations Act, 29 U.S.C. § 160(c); Clayton Act, 15 U.S.C. § 21; Federal Trade Commission Act, 15 U.S.C. § 45(b)]. We are dealing here with the requirements of equity practice with a background of several hundred years of history. Only the other day we stated that "An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity." Meredith v. Winter Haven, 320 U.S. 228, 235, [64 S.Ct. 7, 88 L.Ed. 9]. The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. We do not believe that such a major departure from that long tradition as is here proposed should be lightly implied. . . . Hence we resolve the ambiguities of § 205(a) in favor of that interpretation which affords a full opportunity for equity courts to treat enforcement proceedings under this emergency legislation in accordance with their traditional practices, as conditioned by the necessities of the public interest which Congress has sought to protect.

Our inquiry thus becomes whether, in enacting § 10(*l*), Congress made such "an unequivocal statement of its purpose" as to compel a court of equity to issue an injunction pending a decision by the Board on an unfair labor practice charge, despite its conviction that, on what had been presented to it, the court would not enforce an order finding an unfair labor practice. The words of §

10(*l*) certainly do not make such an unequivocal statement. "Reasonable cause to believe," a phrase often used in the law, is not generally satisfied by so modest a showing as is here claimed to suffice. And saying "the district court shall have jurisdiction to grant such injunctive relief" would be a strange way of declaring that it must do so even when it was convinced that no violation of law had occurred. We therefore turn to the legislative history to see whether this justifies or requires a different conclusion.

Sections 10(j) and (*l*) have their origin in S. 1126, 80th Cong. 1st Sess., as reported. See 1 Legislative History of the Labor Management Relations Act, 1947, 130–32. The accompanying report, authored by Senator Taft, explained, *id.* at 433:

> Experience under the National Labor Relations Act has demonstrated that by reason of lengthy hearings and litigation enforcing its orders, the Board has not been able in some instances to correct unfair labor practices until after substantial injury has been done. Under the present act the Board is empowered to seek interim relief only after it has filed in the appropriate circuit court of appeals its order and the record on which it is based. Since the Board's orders are not self-enforcing, it has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to restore or preserve the status quo pending litigation.

> In subsections (j) and (*l*) to section 10 the Board is given additional authority to seek injunctive relief. By section 10(j), the Board is authorized, after it has issued a complaint alleging the commission of unfair labor practices by either an employer or a labor organization or its agent, to petition the appropriate district court for temporary relief or restraining order. Thus the Board need not wait, if

the circumstances call for such relief, until it has held a hearing, issued its order, and petitioned for enforcement of its order.

Section 10($l$) makes it mandatory upon the Board to petition for injunctive relief in the case of strikes or boycotts that are alleged to constitute unfair labor practices within the meaning of paragraphs (A), (B), and (C) of section 8(b)(4). Moreover, cases of this type are to be given priority, and when the Board agent charged with the investigation has reasonable cause to believe that the charge is true and that a complaint should be issued, he is required to petition the district court for appropriate injunctive relief pending final adjudication by the Board.

Nothing in this remotely suggests the "unequivocal statement" to which the Court had referred. Rather, as said by Justice Douglas, *supra,* 321 U.S. at 329, 64 S.Ct. at 591, "A grant of *jurisdiction* to issue compliance orders hardly suggests an absolute duty to do so under any and all circumstances." When the question is viewed from the time frame of 1947, it seems particularly unlikely that Congress would have wished the courts to act so freely in granting injunctions theretofore forbidden in § 4 of the Norris-LaGuardia Act of 1932, 29 U.S.C. § 104.

This court has previously held that a district court should apply general equitable criteria when the Board seeks an injunction under § 10(j). McLeod v. General Electric Co., 366 F.2d 847 (2 Cir. 1966), vacated as moot, 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967). Presumably those criteria would include some likelihood of success.[17] Yet the only distinction between § 10(j) and § 10($l$)—apart from the fact that the latter can be invoked before issuance of a complaint—is that under § 10($l$) the Regional Director *must* apply once he "has reasonable cause to believe such charge is true and that a complaint should issue,"[18] whereas the Board's decision to apply under § 10(j) is left to its discretion. Nothing in the language of § 10($l$) suggests any intention to prescribe a lesser role for the court than under § 10(j). See Minnesota Mining & Manufacturing Co. v. Meter, 385 F.2d 265 (8 Cir. 1967); Boire v. International Brotherhood of Teamsters, 479 F.2d 778, 787 n. 7 (5 Cir. 1973).

While we do not deny that some of this court's opinions construing § 10($l$) contain bits and pieces of language mildly favorable to the Board's position, we have been cited to no decision going so far as the Board would have us go here and, taken as a whole, their thrust is to the contrary. In a relatively early case, Douds v. Local 50, Bakery & Confectionery Workers, 224 F.2d 49 (2 Cir. 1955), a distinguished panel, speaking through Judge Swan, affirmed the denial of an injunction on the basis that the Regional Director lacked reasonable cause to believe the union had violated § 8(b)(4)(C) as it then stood although neither the district court, 127 F.Supp. 534 (S.D.N.Y.1955), nor this court characterized the Board's contention as "insubstantial and frivolous." Douds v. In-

---

. The difference of opinion between the district court and this court in McLeod v. General Electric Co., *supra,* did not relate to use of the likelihood of success test in the decision to grant or deny an injunction. Judge Frankel had recognized that a district court "might well hesitate to issue an injunction on what it determines are fallacious legal premises," 257 F.Supp. 690, 710 n. 16 (S.D.N.Y.1966).

. This strong language was doubtless inserted to head off the proposal of Senator Ball, and later of Senator Aiken, which would have authorized employers to seek injunctions for illegal picketing in some circumstances. See 93 Cong.Rec. 5036–49, 5064–70 (May 9, 1947), *reprinted in* Legislative History of the Labor Management Relations Act, 1947 at 1347–70, 1377–90. Congressional distrust of the Labor Board's willingness to seek injunctions against picketing did not extend to action by the courts in ruling upon applications for such injunctions.

ternational Longshoremen's Ass'n, 242 F.2d 808, 810 (2 Cir. 1957), reversed the district court's denial of an injunction on the basis that the district court "had no alternative other than to find that there is more than enough evidence to demonstrate" that there was "reasonable cause to believe" a violation had occurred. In Douds v. Milk Drivers & Dairy Employees Union, 248 F.2d 534, 537–538 (2 Cir. 1957), the court restated the "reasonable cause" standard as requiring the district court to determine "whether the Board has come forward with evidence sufficient to spell out a likelihood of violation"—a test thoroughly consonant with reversal here. We do not regard the opinion by Judge Marshall, as he then was, in McLeod v. Business Machine & Office Appliance Mechanics Conference Board, 300 F.2d 237, 241 (2 Cir. 1962), which used the phrase "a reasonable possibility of the Board sustaining the unfair labor practice charge" as changing the criterion; the court there vacated an injunction because "previous Board decisions preclude it from finding an unfair labor practice here without reversing field, and . . . there has been no showing these will be such a reversal." Although the opinion said at one point, "We must, therefore, defer to the clear purport of Board precedents, whether we believe them right or wrong . . . ", 300 F.2d at 242, this must be read in the context that the Board was seeking an injunction *contrary* to precedents on which it had not previously reflected. More important is the statement that the district court must "find reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals," *id.* at n. 17. McLeod v. Local 25, IBEW, 344 F.2d 634, 638 (2 Cir. 1965), another opinion of Judge Marshall, did not change matters, although, after careful scrutiny,

the district court's issuance of an injunction was sustained.[19]

The subject was further discussed in McLeod v. National Maritime Union, 457 F.2d 1127, 1133 (2 Cir. 1972). Although the court reversed the district court's denial of an injunction on the basis that there was "reasonable cause to believe that the unfair labor practice charged had been committed and that its continuation ought to be enjoined," we find nothing in Judge Waterman's opinion that would take us as far down the road to nearly complete judicial abdication by the district court as the General Counsel here seeks. Danielson v. Local 275, Laborers International Union, 479 F.2d 1033 (2 Cir. 1973), is even wider of the mark. In that case, the district judge, although properly convinced that there was reasonable cause to believe a violation had occurred, had denied an injunction solely because he found that the picketed employer would not suffer irreparable harm. Without reaching the question whether irreparable harm must always be demonstrated in a § 10($l$) case, this court reversed because "there was a clear showing of substantial and irreparable harm to the Employer which under any construction of the Act should have resulted in the issuance of the preliminary injunction sought by the Regional Director," 479 F.2d at 1036. Finally, Kaynard v. Independent Routemen's Ass'n, 479 F.2d 1070 (2 Cir. 1973), reversed the denial of an injunction because the district court had not limited itself "to the question as to whether or not there was reasonable cause for the Regional Director to find [an unfair labor practice], but rather finding on the merits that there was no violation," 479 F.2d at 1072. Examining the record, the court on appeal concluded there was ample reason to think that an unfair labor practice had been committed, and the court ordered the injunction to issue on that ground.

19. This court has cited the Third Circuit's *Schauffler* decision in two § 10($l$) cases, McLeod v. Teamsters Local 282, 345 F.2d 142, 145 (2 Cir. 1965), and McLeod v. National Maritime Union, 457 F.2d 490, 493 (2 Cir. 1972), but on neither occasion did the court adopt the "frivolous and insubstantial" language from that opinion.

**1244**

In sum, nothing in the statutory language, the legislative history or our prior decisions[20] would justify, much less require, our holding that in § 10(l) Congress directed the district courts to issue an injunction whenever the Regional Director has advanced a claim sufficiently "thoughtful" to escape being branded as "insubstantial *and* frivolous" (emphasis supplied), see *Samoff, supra*, 475 F.2d at 207. It does not matter overmuch whether our holding that the district court's duty of scrutiny is greater than this is predicated on a more nearly normal reading of "reasonable cause to believe" on the part of the Regional Director in the second sentence of § 10(l), an issue which all the cases have considered as open to *some* judicial scrutiny, or on reading the grant to the district court in the third sentence of "jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper" as incorporating the principle of requiring a showing, perhaps not of probability of success but at least of some significant possibility that the Board will enter an enforceable order, or on both. If the second is a proper basis, the district court's action is clearly subject to full appellate review. If the former alone is relevant, most of our cases suggest that a district court's determination that the Regional Director had reasonable cause to believe a violation has occurred is not sheltered by the "unless clearly erroneous" rule, F.R.Civ.P. 52(a). Any other position

would run counter to this court's long held view that application of a legal standard to the facts is not "a finding of fact." See Mamiye Bros. v. Barber S. S. Lines, Inc., 360 F.2d 774, 776–778 (2 Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966), citing many cases; In re Hygrade Envelope Corp., 366 F.2d 584, 588–589 (2 Cir. 1966) (reasonable cause to believe debtor was insolvent). Although there are intimations in some early cases that the "clearly erroneous" rule was the proper standard for review of § 10(l) injunctions, McLeod v. Chefs Local 89, 280 F.2d 760, 763 (2d Cir. 1960); Vincent v. Steamfitters Local 395, 288 F.2d 276, 278 (2 Cir. 1961), we have since made it clear that the district court's determination that there is reasonable cause to believe an unfair labor practice has been committed is a question of law subject to full appellate review. McLeod v. Business Machine & Office Appliance Mechanics Conference Board, *supra*, 300 F.2d at 239; McLeod v. Teamsters Local 282, *supra*, 345 F.2d at 145.[21] Despite the contrary view taken by some other circuits,[22] the issue before the district judge in this case was solely one of law.

The Third Circuit argued in *Schauffler, supra*, 292 F.2d at 188, that "[i]f, in a Section 10(l) proceeding, a district court or a court of appeals undertook to finally adjudicate" propositions of law, "it would not be acting consistently with the congressional policy underlying Section 10(l)." But we are not undertak-

20. It seems to be common ground that no Supreme Court decision deals with the issue.

21. We do not regard the contrary suggestion in dictum in McLeod v. National Maritime Union, *supra*, 457 F.2d at 1133, as altering the clear rule set out in these cases.

22. *E. g.*, Schauffler v. Local 1291, Int'l Longshoremen's Ass'n, *supra*, 292 F.2d at 187; AFTRA v. Getreu, *supra*, 258 F.2d at 699; Madden v. International Org'n of Masters, Mates & Pilots, 259 F.2d 312, 313 (7 Cir.), cert. denied, 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 229 (1958); Local Joint Board, Hotel & Restaurant Employees v. Sperry, *supra*, 323 F.2d at 77; Warehousemen's Union, Local 6 v. Hoffman, 302 F.2d 352, 353 (9 Cir. 1962). See also Angle v. Sacks, 382

F.2d 655, 661 (10 Cir. 1967) (§ 10(j) ); Minnesota Mining & Mfg. Co. v. Meter, *supra*, 385 F.2d at 269 (§ 10(j) ).

Judge Goldberg, in Boire v. International Bhd. of Teamsters, *supra*, 479 F.2d at 793, stated the correct view:

The factual findings of the District Court, i. e., what happened and what will happen, are reviewable under the "clearly erroneous" standard as are all factual questions. The need for equitable relief is left to the discretion of the District Court in the first instance and is only reviewable to the extent that such discretion has been abused. The lower court's legal conclusions . . . are subject to the same standard of review as any legal conclusion of the District Court: was it correct?

ing to adjudicate anything "finally." The Board is free to render whatever decision it deems proper in the unfair labor practice proceeding and to give this opinion whatever weight it chooses; our decision is not intended to have any preclusive effect. Conceivably, although we do not regard this as likely in light of the thorough brief submitted on behalf of the General Counsel, the Board, if unpersuaded by what we have said, may evolve some factual or legal justification for the position of the General Counsel that is not now apparent to us. While it is true that, as said in *Schauffler*, this court does "not have the benefit of the Board's opinion on questions of fact and novel questions of labor law when making its decision," we do not agree that, so far as concerns questions of law, "the court would, to some extent, usurp the Board's . . . function as primary interpreter of the statutory scheme." 292 F.2d at 188. We have had the benefit of an exposition of the General Counsel's views of the law quite as full as usually made in a Board decision, and our opinion is our first word, not our last.

When Congress enacted § 10(*l*), it was thinking primarily of the run of the mine cases where the law was relatively plain although the facts might be in serious dispute, not of a new adventure of the General Counsel in the interpretation of a statute fourteen years after it had come on the books. In such a case it is more realistic to regard the status quo as what everyone had assumed it to be until General Counsel evolved his new theory, rather than this employer's position the moment before the pickets appeared. When that occurs, we think Congress would have wished the courts to perform their traditional role rather than enjoin conduct which they consider clearly lawful even for the interval before the Board has determined whether an unfair labor practice has occurred and has sought enforcement of an order

finding that it has. Although the Board has thus far processed the unfair labor practice charge in the instant case with commendable speed, this has not always been true. In any event it runs too much against the judicial grain to enjoin conduct which a court regards as lawful for us to sanction such an injunction without clearer evidence that this is what Congress wanted. While we naturally regret our inability to join with other courts of appeals that have read the statute differently, we must follow our own star.

■ Prospective picketers should not take our decision here as saying more than it does. When "reasonable cause to believe" turns on disputed issues of fact, the Regional Director may assume these in favor of the charge and the district court should sustain him if his choice is within the range of rationality. If differing inferences may fairly be drawn from the facts he has found, he may choose the one more favorable to the charging party, and this too should be upheld. Even on an issue of law, the district court should be hospitable to the views of the General Counsel, however novel. We hold only that when, after full study, the district court is convinced that the General Counsel's legal position is wrong, as Judge Gurfein properly was here, it should not issue an injunction under § 10(*l*).

The injunction should therefore be reversed. Since the General Counsel has suggested no further facts he could advance to sustain the petition, it should be dismissed. See Triumph Hosiery Mills, Inc. v. Triumph International Corp., 308 F.2d 196, 200 (2 Cir. 1962). The injunction is stayed pending the issuance of the mandate and any proceedings the Regional Director may be advised to take thereafter, upon condition that the union revise the sign to eliminate any implication that a strike is in progress at Hazantown when this is not the fact.