**Edwin H. BENNETT, Acting Regional Director, Region 2 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**LOCAL 456, TEAMSTERS AND CHAUFFEURS UNION, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Respondent.**

No. 78 Civ. 1675.

United States District Court, S. D. New York.

Oct. 10, 1978.

Joel P. Biblowitz, N. L. R. B., New York City, for petitioner.

Roy Barnes, P. C., Hempstead, N. Y., for respondent Teamsters Local 456.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

Petitioner Edward H. Bennett, Acting Director of Region 2 of the National Labor Relations Board ("the Board"), seeks a preliminary injunction under § 10(*l*) of the National Labor Relations Act, 29 U.S.C. § 160(*l*) ("the Act"),[1] to restrain the respondent, Local 456 of the Teamsters and Chauffeurs Union ("the Union") from picketing claimed to be "secondary" in violation of § 8(b)(4)(B) of the Act, 29 U.S.C. § 158(b)(4)(B). While the Union's primary dispute is with Carvel Corp. ("Carvel"), the picketing—should the Union ultimately prevail[2]—would be conducted on or near the premises of independently-owned Carvel franchise stores, whose business derives almost exclusively from the sale of Carvel products. The Union hopes that such picketing would influence the outcome of its dispute with Carvel. This case, one of first impression in this Circuit, poses two hard questions: (1) whether Carvel and the franchises are so intertwined that they may be considered a single employer for the purposes of § 8(b)(4)(B); and (2) whether picketing of the franchises is protected under the "struck product" doctrine of *N.L.R.B. v. Fruit & Vegetable Packers (Tree Fruits)* (1964) 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129. Having given the Board's interpretation of the relevant law the deference it is due in a § 10(*l*) proceeding, *Kaynard v. Local 282, Intern'l Brotherhood of Teamsters, etc.* (2d Cir. 1978) 576 F.2d 471, at 477, *Danielson v. Joint Board of Coat, Suit & Allied Garment Workers' Union* (2d Cir. 1974) 494 F.2d 1230, 1245,[3] we find that the Board has reasonable cause to believe that the picketing in question would violate the Act and has demonstrated that equitable relief would be just and proper. We accordingly will issue the requested preliminary injunction.

### Facts

Shortly prior to March 9, 1978, the Union requested that Carvel recognize it as the collective bargaining representative for employees at a Carvel warehouse located on Saw Mill Road in Yonkers, New York. Carvel denied the request and on March 9 the Union commenced lawful recognitional picketing at the warehouse and at four Carvel-owned retail outlets. The picketing at these five locations failed to attract public attention and was ineffective.

On or about March 25, 1978, the Union mailed letters to operators of independently-operated Carvel retail stores ("the franchisees") in Westchester County, enclosing copies of an article from a local newspaper, which stated that the Union planned to picket the Westchester County franchisees.

1. Section 10(*l*) provides in pertinent part:
 "Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph 4 . . . (B) . . of section 158(b) of this title . . . the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law."

2. The Union agreed that, pending a decision on the petition for preliminary injunction, it would not picket, or threaten to picket, the disputed locations.

3. In *Danielson, supra,* the court with respect to applications for § 10(*l*) injunctions declared "the district court should be hospitable to the views of the General Counsel, however novel. We hold only that when, after full study, the district court is convinced that the General Counsel's legal position is wrong . . . it should not issue an injunction under § 10(*l*)." Id., 494 F.2d at 1230.

It in fact commenced to picket the store of one such franchisee on April 1, 1978. The picketers carried signs reading: "LOCAL 456 INTERNATIONAL BROTHERHOOD OF TEAMSTERS TO THE PUBLIC: DO NOT BUY CARVEL PRODUCTS."

Carvel filed charges of unfair labor practices against the Union with Region 2 of the Board. After investigating the charges, the Acting Regional Director of the Board issued a complaint alleging violations by the Union of § 8(b)(4) and commenced this action for a preliminary injunction under § 10(*l*) of the Act. A hearing was held before an administrative law judge, which by stipulation constitutes the entire record before us. We have also had the benefit of unusually able briefing and oral argument by counsel for both parties.

Since an understanding of the relationship between Carvel and the franchisees is essential to the issues before us, we will describe that relationship in some detail. Carvel is engaged in awarding retail ice cream store franchises to persons who distribute, under the Carvel name, various products Carvel supplies to them. The relationship between Carvel and each franchisee is governed by a standard agreement. Under the agreement, each franchisee agrees to pay Carvel a fixed sum (currently about $15,000) as an initial "trademark license fee." The franchisee further agrees to purchase from Carvel or another approved source almost all of the items that become part of products the franchisee ultimately sells to the public. These items include ice cream cones, toppings, flavorings, and most importantly, the "special for-mula" Carvel ice cream mix which may be obtained only from Carvel itself. In addition, franchisees are required under the agreement to buy commissary items, such as packaging supplies and spoons, from Carvel or another approved source. There is no evidence that any franchisee has in fact purchased such items from anyone other than Carvel.

Franchisees may, if they wish, sell some products other than those available from Carvel, such as coffee, milk for coffee,[4] and fruit, including the bananas used in banana splits. Such goods, however, do not represent any substantial part of the franchisees' total business, which consists almost entirely of the sale of Carvel products.[5]

In addition to products and commissary items, franchisees are bound under the agreement to purchase from Carvel or another approved source certain machinery vital to their operation. Although a few franchisees do purchase some equipment from other approved sources, most rely upon Carvel. Indeed, the front gate assembly, a piece of equipment crucial to the franchisees' process, is patented by Carvel and can be obtained only from it.

The franchisees thus obtain almost all of their equipment, supplies, and commissary items from Carvel. Conversely, Carvel—with the exception of the few retail outlets it owns and operates—does not supply these items to anyone other than its franchisees.[6] The franchisees pay Carvel—in addition to the purchase price on all items—a royalty on each gallon of special formula mix as an ongoing payment for use of the Carvel trademark. Each franchisee is committed

---

4. Milk for ice cream may not be so obtained.

5. The transcript of the hearing before the Administrative Law Judge reads, pp. 62–63:

"Q I'm just not clear on who else supplies and gives [the licensee] other products to sell. That is what is confusing me.

"A His local dairy, I believe, Mrs. Grossman testified, sells him milk. Somebody sells fruits, will sell him fruit. I assume grocery stores sells [sic] him coffee. Just three examples.

"Q Would you give me a ballpark estimate as to what percentage his total sales are represented by these three items you men-tioned, dairy, milk, and vegetables, groceries, more than five percent?

"A I don't really know. That sounds fair to me."

6. Carvel is engaged in certain other enterprises including donut and health food retail operations. Although the record is not completely clear on this matter, it appears that these operations are a minor part of Carvel's total operation, most of which consist of its ice cream business. Even were this not so, it would not change significantly the relationship between Carvel and its ice cream store franchisees.

under the agreement to paying a specified minimum royalty annually.[7] In addition, each agrees to contribute a fixed sum per gallon of special formula mix towards Carvel's national advertising and promotional expenses.[8] These various sources of revenue bring Carvel an estimated forty-seven million dollars annually. Of this total, some forty million is generated by the sale of Carvel products, commissary items, and equipment. The remaining seven million is revenue from trademark license fees, royalties, and interest income.

Neither Carvel nor any franchisee appears to own the property on which retail stores are located. Rather, Carvel leases such property and assigns the lease to the franchisee.[9] If construction or renovation is necessary to make a location suitable for operation as a Carvel franchise, such work is arranged and paid for by the franchisee. Carvel, however, provides design specifications that the franchisee must follow unless it obtains Carvel's approval of a variance. Franchisees are responsible for obtaining the local, county, and state certificates necessary for operation, such as health and occupancy permits.

Franchisees initially participate in a fifteen-day training program in Yonkers, New York and apparently continue some training throughout the franchise relationship. They operate their stores, however, with a fair degree of autonomy. Each franchisee, for instance, determines what hours its store stays open. Carvel makes recommendations on the subject, but franchisees have ignored them without any pressure from Carvel. Similarly, franchisees are supposed to have their employees wear Carvel uniforms, but many have not without suffering any sanction from Carvel. More importantly, each franchisee determines which of the various Carvel products it will carry, the amount of each it will purchase from Carvel, and the price at which it will sell its product to the public. Carvel does not even recommend retail prices for most items, although it does do so for some special products. The franchisee decides what items to display and how each is to be packaged.

Finally, the franchisee controls its labor relations with its own employees. It selects and hires them and determines their wages, hours, and terms and conditions of employment, all independently of Carvel. Carvel likewise conducts its own labor relations with similar independence from the franchisees. There is little exchange of employees between Carvel and the franchise outlets.

Franchise agreements normally run for a period of ten years, with an option for renewal. During this period, transfer of the franchise is restricted. Should a franchisee decide to sell its business, Carvel has an option of first refusal. If Carvel decides not to buy back the franchise, it may be sold only under conditions specified in the agreement.

## Discussion

The Board now contends that picketing of the franchisees by the Union in an effort to influence the outcome of its dispute with Carvel would constitute secondary picketing banned by § 8(b)(4)(B) of the Act.[10] To

---

7. The record does not reveal how often—if ever—normal royalty payments have fallen below this minimum.

8. Although at one time participation in the national advertising fund was voluntary, it is mandatory under all new agreements. Seventy-five to 80% of the franchisees now contribute. Independent of the national advertising fund, individual franchisees may, and do, advertise on their own.

 Franchisees are not obligated to pay Carvel any percentage of their total sales.

9. A real estate subsidiary handles lease negotiations for Carvel. A Carvel vice-president testified before the Administrative Law Judge that licensees are apt to have little of Carvel's experience or bargaining power in negotiating a lease.

10. Section 8(b) provides in pertinent part:

 "It shall be an unfair labor practice for a labor organization or its agents—

 (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles,

avoid this conclusion, the Union first urges that the franchisees are so allied with Carvel that they are not neutrals in the primary dispute, and second, that the Union action would in any event constitute "struck product" picketing outside the ambit of the statutory prohibition. If either of the Union's arguments were accepted, the picketing could go forward unrestrained.

A. *Neutrality.* Section 8(b)(4)(B) was designed, as Senator Taft explained, to make it "unlawful to resort to a secondary boycott to injure the business of a third person who is wholly unconcerned in the disagreement between an employer and his employee." 93 Cong.Rec. 4198 (1947) (remarks of Sen. Taft). To achieve this result, Congress prohibited unions from exerting "pressure tactically directed toward a neutral employer in a labor dispute not his own." *National Woodwork Manufacturers Ass'n v. NLRB* (1967) 386 U.S. 612, 623, 87 S.Ct. 1250, 18 L.Ed.2d 357.

The Act's protection for uninvolved neutrals, however, does not extend to third persons who "ally" themselves with the primary employer.[11] As Senator Taft later commented (95 Cong.Rec. 8709 (1949)):

"The secondary boycott ban is merely intended to prevent a union from injuring a third person who is not involved in any way in the dispute or strike, and therefore should not suffer economic damage simply because of the action of a labor organization. It is not intended to apply to a case where the third person is, in effect, in cahoots with or acting as a part of the primary employer."

An alliance between employers may arise from performance of work that otherwise would have been the task of striking employees, see *Woodwork Manufacturers, supra,* 386 U.S. at 627, 87 S.Ct. at 1259; *Douds v. Metropolitan Federation of Architects* (S.D.N.Y.1948) 75 F.Supp. 672, or it may be deemed to exist from a combination of circumstances. Among the circumstances relevant in distinguishing neutral from allied employers are "the extent to which a corporation is de facto under the control of another corporation, the extent of common ownership of the two employers, the integration of the business operations of the two employers, and the dependence of one employer on the other employer for a substantial portion of its business." *NLRB v. Local 810, Steel, Metals, Etc., Bro. of Team., Etc.* (*Sid Harvey*) (2d Cir. 1972) 460 F.2d 1, 5, cert. denied 409 U.S. 1041, 93 S.Ct. 527, 34 L.Ed.2d 491. Such factors, as the Court noted in *Sid Harvey,* are not to be mechanically applied, but instead should be considered as part of a flexible, common sense inquiry into the "essence of the relationship" between the two employers. *Sid Harvey, supra,* 460 F.2d at 6, quoting *Vulcan Materials Co. v. United Steelworkers of America* (5th Cir. 1970) 430 F.2d 446, 451, cert. denied (1971) 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247.

Applying these principles to the instant case yields no self-evident conclusions. On the one hand, Carvel and the franchisees are, as the Union notes, wholly dependent upon each other for their economic survival. With only *de minimis* exceptions, Carvel

---

materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

. . . . .

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such

employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing."

11. This distinction between allies and neutrals reflects the "dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." *Woodwork Manufacturers,* supra, 386 U.S. at 626–27, 87 S.Ct. at 1259.

supplies its products only to the franchisees, who in turn sell virtually nothing else to the public. Their relationship thus typifies the "straight-line operation," in which various entities each perform segments of a single, coordinated business effort. The connection between them is in some ways even closer than the link between the arms of a simple straight-line effort. In the franchise relationship, the franchisees capitalize on the Carvel name and product, and Carvel, which relies on the franchisees to market its goods, attempts to insure the success of that marketing by supervising, in some detail, the franchisees' day-to-day operations. Carvel specifies some procedures and recommends others to the franchisees. For example, when new stores are to be built or old ones renovated (all at the franchisee's expense), Carvel decides their design. More significantly, it dictates both the equipment to be used by the franchisee and the source from which that equipment must be obtained. For some equipment, the only such source is Carvel itself. Similarly, almost all of the products and commissary items sold by the franchisees must be purchased from Carvel.

In other matters, however, the independently-owned franchisees conduct their business with a high degree of autonomy.[12] As we have noted, the individual franchise makes its own marketing decisions, determining the hours its store stays open, the products it carries, and the prices at which it sells them. The franchisee also controls its labor relations with its own employees. Nor, apparently, do the franchisees have any voice in *Carvel's* labor relations with *its* employees. There is no evidence that they participate in negotiations between Carvel and its workers. Compare *Royal Typewrit-*

*er Co. v. NLRB* (8th Cir. 1976) 533 F.2d 1030.

Various other factors also point toward a finding of neutral status. There is no evidence that Carvel and the franchisees share the same premises or utilize a common switchboard, cf. *Sid Harvey, supra,* exchange employees, cf. *Sid Harvey, supra,* or interchange functions.

Were this the end of the matter, we would be hard put to finally determine whether the franchisees as a group are neutrals in the Union's dispute with Carvel. While the Board "does not normally predicate loss of neutral status on economic interdependency alone . . .,"[13] the level of interdependence here goes beyond that normally presented by such cases. The Court of Appeals for the Fifth Circuit has commented that a secondary employer may be considered an ally of the primary when "the economic fortunes of the two . . . are inextricably interwoven, as, for example, where [one] does substantially all his business with the [other]." *Vulcan Materials, supra,* 430 F.2d at 451. Also see *Honolulu Typographical Union No. 37 v. NLRB* (1968), 131 U.S.App.D.C. 1, 401 F.2d 952, 956 n.9. At least where such interdependence is coupled with a high degree of common ownership, "[a]ny other rule would permit the employer to divide and conquer by doing business through several corporations . . ." Levin, "Wholly Unconcerned": The Scope and Meaning of the Ally Doctrine and Section 8(b)(4) of the NLRA, 119 U.Pa.L.Rev. 283, 320 (1970). Common ownership, however, is not present here. Rather, each franchise is owned by a person or persons with no affiliation with Carvel who often have made significant investments—beyond the payment of a sub-

12. The Board refers us to *Quick Markets, Inc. v. Retail Clerks,* 446 F.Supp. 733 (E.D.Mo. 1978). That case, a suit under § 303 of the Act, 29 U.S.C. § 187, involving facts and issues somewhat similar to the instant case, held that franchisees there were neutral in a dispute between a union and the franchisor. The district court held that "[t]he business operations, while in some ways related, were not integrated and the franchisees did not depend upon [the franchisor] for a substantial portion of its business. In fact, in some instances, franchisees' stores were in competition with [other] stores." Id. at 738.

13. *Local 14055, United Steelworkers of America (Dow Chemical)* 211 NLRB 649, No. 59, enforcement denied on other grounds (1975), 173 U.S.App.D.C. 299, 524 F.2d 853, cert. granted and judgment vacated (1976) 429 U.S. 807, 97 S.Ct. 42, 50 L.Ed.2d 68.

stantial franchise fee—by constructing or renovating their stores. And while Carvel does prescribe some aspects of the franchisee's operations, it leaves various other aspects to their discretion. Taking into account all these factors, it is far from clear on which side of the indistinct boundary between neutrality and alliance the franchisees as a group belong.

■ We do not, however, believe this to be the end of the matter. As was conceded upon oral argument, the proposed picketing would not in fact be spread over the franchisees as a group, but rather would be confined to a few of them—or at least to a few at any given time. This reality suggests that a focus upon the franchisees individually rather than as a group is appropriate here. Once perspective shifts in this manner, the picture becomes quite different. While Carvel is completely dependent upon the franchisees as a group, it is not dependent upon any one of them. Were any one—or a small group—of the 750 franchisees shut down in the course of a prolonged labor dispute, sales would go on unimpeded in the rest of the 750.[14] Considering all these circumstances and according the Board the deference it is due in a 10(*l*) proceeding, *Danielson, supra,* we conclude that the Board has reasonable cause to believe that the affected franchisees would be neutrals in the Union's dispute with Carvel.

B. *Applicability of Tree Fruits.* More troubling is the Union's contention that the picketing here would be protected under the Supreme Court decision in *Labor Board v. Fruit Packers (Tree Fruits)* (1964) 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129. In that case, the Court held that a union did not violate § 8(b)(4) by picketing a neutral employer, Safeway Stores, to urge that its customers not buy a product, Washington State apples, supplied to it by firms with whom the union did have a dispute. Ana-

lyzing the legislative history, the Court found such picketing to be "poles apart" from picketing designed "to shut off all trade with the secondary employer . ." *Id.,* 377 U.S. at 70, 84 S.Ct. at 1070. As Mr. Justice Brennan wrote for a five-justice majority (377 U.S. at 63–64, 84 S.Ct. at 1066): [15]

> "All that the legislative history shows in the way of an 'isolated evil' believed to require proscription of peaceful consumer picketing at secondary sites was its use to persuade the customers of the secondary employer to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer. This narrow focus reflects the difference between such conduct and peaceful picketing at the secondary site directed only at the struck product. In the latter case, the union's appeal to the public is confined to its dispute with the primary employer, since the public is not asked to withhold its patronage from the secondary employer, but only to boycott the primary employer's goods. On the other hand, a union appeal to the public at the secondary site not to trade at all with the secondary employer goes beyond the goods of the primary employer, and seeks the public's assistance in forcing the secondary employer to cooperate with the union in its primary dispute. This is not to say that this distinction was expressly alluded to in the debates. It is to say, however, that the consumer picketing carried on in this case is not attended by the abuses at which the statute was directed."

The facts in *Tree Fruits* were quite different from those presented by the case now before us. While Washington State apples were "only one of numerous food products sold" in the Safeway supermarket, *id.* 377 U.S. at 60, 84 S.Ct. at 1065, the Carvel goods are essentially the only prod-

---

**14.** The dependence of each franchisee upon Carvel would of course remain total.

**15.** Mr. Justice Harlan, joined by Mr. Justice Stewart, dissented, construing the Act as proscribing all consumer picketing of a secondary employer. Mr. Justice Black, who concurred in the judgment, agreed with the dissenters on the interpretation of the Act, but found such a broad statutory prohibition to violate the First Amendment's free speech clause. Mr. Justice Douglas did not participate in the case.

ucts carried by the franchisees here. Since picketing that follows Carvel goods is thus necessarily aimed at the franchisee's business in general, the case does not fit neatly into the Supreme Court's dichotomy between protected picketing limited to the struck product and prohibited picketing designed to shut down the neutral's operation.

The difficult problem we now consider was posed as a hypothetical by Mr. Justice Harlan in his *Tree Fruits* dissent (377 U.S. at 83, 84 S.Ct. at 1076):

> "The distinction drawn by the majority becomes even more tenuous if a picketed retailer depends largely or entirely on sales of the struck product. If, for example, an independent gas station owner sells gasoline purchased from a struck gasoline company, one would not suppose he would feel less threatened, coerced, or restrained by picket signs which said 'Do not buy X gasoline' than by signs which said, 'Do not patronize this gas station.' To be sure Safeway is a multiple article seller, but it cannot well be gainsaid that the rule laid down by the Court would be unworkable if its applicability turned on a calculation of the relation between total income of the secondary employer and income from the struck product."

The absence of any response in the majority opinion to the Harlan hypothetical indicates that *Tree Fruits* may leave open the situation of the single-product seller.

We are aware of only one case in which a court has considered this issue,[16] *Local 14055, United Steelworkers of Am. v. NLRB (Dow Chemical)* (1975) 173 U.S.App. D.C. 299, 524 F.2d 853, cert. granted and judgment vacated and remanded with directions to remand to the Board for reconsideration in light of intervening circumstances (1976) 429 U.S. 807, 97 S.Ct. 42, 50 L.Ed.2d 68.[17] In that case, the secondary employers were a chain of gas stations whose sales of the struck products—gasoline, oil, and other such goods—accounted for up to 98% of the total income of the various stations. The Board had found *Tree Fruits* inapposite, holding that "[w]here by the nature of the business and of the picketing it is likely that customers who are persuaded to respect the picket signs will not trade at all with the neutral party, . . . a true *Tree Fruits* situation does not exist", and observing that the picketing, if successful, would squeeze the neutrals to "a position of duress, escapable only by abandoning Dow in favor of a new source of supply", (211 NLRB at 651). It accordingly had concluded that the union

**16.** The Court of Appeals for the District of Columbia refrained from reaching this issue in *Honolulu Typographical Union, Local 37 v. NLRB* (1968) 131 U.S.App.D.C. 1, 5 n. 9, 401 F.2d 952, 956 n. 9.

**17.** The circumstance that intervened between the decision of the Court of Appeals in Dow and the Supreme Court's grant of certiorari was that the charter of the respondent union had been revoked. The union claimed—in response to Dow's petition for certiorari—that this event mooted the case and that certiorari should accordingly be denied. In a reply brief, Dow raised various legal and factual objections to the union's claim of mootness. It urged the Court to grant certiorari to resolve the question of the applicability of *Tree Fruits* or alternatively to remand for resolution of the factual issues relating to mootness. Dow, citing *United States v. Munsingwear* (1950) 340 U.S. 36, 40–41, 71 S.Ct. 104, 107, 95 L.Ed. 36, also specifically suggested that the Court vacate the lower court's judgment to "prevent [it] . . . from spawning any legal consequences." The Court, for reasons it left unarticulated, followed

this last suggestion and vacated the judgment below. As the Court of Appeals for the Fifth Circuit has noted, the effect of so vacating the judgment of the lower court is "to take away from it any precedential effect." *Troy State University v. Dickey* (5th Cir. 1968) 402 F.2d 515, 516, *Tyson v. Cazes* (5th Cir. 1966) 363 F.2d 742, 744 n. 8. Instead of vacating the judgment below, the Court could either have denied certiorari or granted it and dismissed the appeal for mootness, two avenues that would have left in effect the judgment of the Court of Appeals. See generally Note, Cases Moot on Appeal: A Limit on the Judicial Power, 103 U.Pa.L.Rev. 772 (1955); Comment, Disposition of Moot Cases by the United States Supreme Court, 23 U.Chi.L.Rev. 77 (1955). Of course, regardless of whether an appeal is dismissed or a judgment vacated, and the lower court's reasoning still retains whatever persuasive power it may possess. *United States v. Wolfe* (S.D.N.Y.1964) 232 F.Supp. 85, 101; see *Granville-Smith v. Granville-Smith* (3d Cir. 1954) 214 F.2d 820.

action would violate § 8(b)(4). The Court of Appeals for the District of Columbia Circuit declined to enforce the Board's order, interpreting *Tree Fruits* to protect any consumer picketing confined to struck products regardless of the importance of such products to the secondary's business. Thus, speaking through Judge Fahy, it observed (524 F.2d at 859–60):

> "In according to employees . . ., the right to publicize in a peaceful manner their dispute with a primary party by making it known at a secondary site where the primary's struck product is offered for sale, we think the Court did not consider that the lawfulness of the exercise of the right depended upon differences in the degree of the possible economic impact upon the secondary; an unlawful object was not to be imputed from the possible economic effect of the picketing if it was peaceful and directed only to the struck product. This we think is the situation even though the economic effect were predictably severe if the picketing became very successful. As the dissenting Board members stated in the present case, 'the appeal did not extend beyond Bay gasoline, the struck product'; therefore, nothing in the Union's conduct 'goes beyond the limits approved in *Tree Fruits.*' With such an appeal any coercion which might grow out of the fact that sales of Bay gas represented most of the station's gross revenue is not unlawful under section 8(b)(4), for the object of the appeal is not condemned by that section."

The *Dow* court's reading of *Tree Fruits* has much persuasiveness. Indeed, inasmuch as *Tree Fruits* protects struck product consumer picketing in part because of its proximity to the primary dispute,[18] it may plausibly be argued that this case presents an even stronger one for protection of union activity than did *Tree Fruits.* Surely, picketing moves no further from the primary dispute merely because the businesses of the primary and secondary employers are intertwined.[19]

The contrary position, however, is not without appeal. While the *Tree Fruits* Court found that the picketing in the case before it was not attended by the specific, isolated evils that Congress sought to ban, it may plausibly be argued that one of those evils—the use of peaceful picketing to "persuade the customers of the secondary employer to cease trading with him in order to force him . . . to put pressure upon, the primary employer" (*Tree Fruits, supra,* 377 U.S. at 63, 84 S.Ct. 1066)—is not merely present but inevitable here.

■ In considering the applicability of *Tree Fruits,* we find it appropriate to emphasize once again the limited nature of the review we now exercise. In passing upon this application for a § 10(*l*) injunction, we are not called upon to finally decide the issues presented. Rather, our role is limited to determining whether there is "some significant possibility" (*Danielson, supra,* 494 F.2d at 1244), that the picketing here would violate the Act. It seems to us that the

---

**18.** The Court declared that (377 U.S. at 72, 84 S.Ct. at 1071):

> "When consumer picketing is employed only to persuade customers not to buy the struck product, the union's appeal is closely confined to the primary dispute. The site of the appeal is expanded to include the premises of the secondary employer, but if the appeal succeeds, the secondary employer's purchases from the struck firms are decreased only because the public has diminished its purchases of the struck product. On the other hand, when consumer picketing is employed to persuade customers not to trade at all with the secondary employer, the latter stops buying the struck product, not because of a falling demand, but in response to pressure designed to inflict injury on his business gener-

ally. In such case, the union does more than merely follow the struck product; it creates a separate dispute with the secondary employer."

**19.** Any other conclusion would lead to the anomalous result that a high degree of economic interdependence would, on the one hand, suggest that the union activity would be the protected picketing of an "ally," see discussion supra, but, on the other, that the same activity should be banned as designed to wholly shut the involved employer. Such inconsistent treatment of the same factor—economic interdependence—strikes us as somewhat less than logical. See Minch, Consumer Picketing: Reassessing the Concept of Employer Neutrality, 65 Cal.L.Rev. 172 (1977).

mere fact that the Supreme Court granted certiorari in *Dow* (see fn. 16, *supra*) suggests that there is indeed such a possibility.[20]

This conclusion compels us to address the further question of whether a ban on the picketing would be consistent with the First Amendment's protection of free speech.

 Neither the Supreme Court majority in *Tree Fruits* nor the Court of Appeals in *Dow Chemical* found it necessary to reach this constitutional question. It was, however, discussed in both the concurring and dissenting opinions in *Tree Fruits.* The prevailing opinion noted that it was a difficult question which was avoided by the Court's construction of the statute. Mr. Justice Black thought that a construction of the statute which authorized enjoining the picketing in question would be clearly unconstitutional. Mr. Justice Harlan (with Mr. Justice Stewart's concurrence) summarized his reasons for believing that such picketing could be enjoined without violating the Constitution. We are persuaded by the reasons advanced by Mr. Justice Harlan and find that the injunction the Board requests does not violate the First Amendment.

 C. *Propriety of Equitable Relief.* Finally, we must consider whether the Board has demonstrated that equitable relief here would be "just and proper." *Kaynard v. Local 282, Teamsters, supra.* This issue need not detain us. As we have noted, the picketing here could bring tremendous pressure to bear upon a handful of neutral franchisees—or at least upon a handful of them at any given time—with correspondingly little impact upon the primary employer, Carvel. In light of the severity of the potential harm to the few affected franchisees, we find equitable relief to be both just and proper.

The Board is directed to submit an appropriate order upon five days' notice.

SO ORDERED.

20. We reject the Board's contention that Carvel's products are so "merged" with the products of other suppliers that the picketing here could not be confined to the struck product as was the picketing in *Tree Fruits.* The only instance of such merger cited by the Board involves the sale of banana splits by the franchisees. While the ice cream for the banana splits is supplied by Carvel, the bananas are *obtained from other sources.* The Board argues from this that an appeal not to buy Carvel products is thus necessarily an appeal not to buy the independently-supplied bananas as well. Were the products like the bananas anything more than a negligible part of the franchisees' total sales, and were Carvel's products less readily identifiable, we would undoubtedly find this argument more persuasive than it is upon the facts before us. This case is unlike *American Bread Company v. NLRB* (6th Cir. 1969) 411 F.2d 147, in which a union picketed various restaurants to influence a dispute it had with American Bread, urging that the restaurants' customers refrain from purchasing any American Bread products. In rejecting the union's claim that the picketing was protected by *Tree Fruits*, the Court of Appeals for the Sixth Circuit noted that "American Bread's output was integrated into the meals served by the restaurants and could not readily be recognized by the customers as to particular brand. In order for customers to express sympathy for the Teamsters' cause, they would necessarily have to refrain from ordering any meal served with bread or bakery products. This would entail practically a boycott on all the meals served in the establishments." Id., 411 F.2d at 154.